FIRST MID AMERICA, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE, v. KAY F. PALMER, APPELLEE AND CROSS-APPELLANT.

248 N. W. 2d 30

Filed December 22, 1976. No. 40528.

Knudsen, Berkheimer, Endacott & Beam, for appellant.

McGrath, North, O'Malley, Kratz, Dwyer, O'Leary & Martin and Fortes, Eiger, Epstein & Skirnick, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

WHITE, C. J..

This suit was brought by the plaintiff, First Mid America, Inc., against the defendant, Kay F. Palmer, to recover upon an account which the defendant had opened with the plaintiff for the purpose of trading commodities futures contracts. The account was opened by the defendant in June of 1973 and closed by the plaintiff in August of 1973. On the date of the closing, the account had a debit balance of $31,329.11.

The defendant alleged three affirmative defenses to the plaintiff's suit for the account balance. First, that certain orders were entered without authority; second, that the plaintiff violated a contractual and fiduciary duty owed the defendant by not following the defendant's specific instructions concerning liquidating his account if it became undermargined and by violating

various exchange rules; and, third, that the transactions constituted illegal gambling transactions.

At the close of the evidence, both sides moved for a directed verdict in their favor. Both of these motions were denied. The jury returned a verdict for the defendant. The plaintiff then moved for judgment notwithstanding the verdict or for a new trial. This motion was also denied. The plaintiff appeals the denial of its motions for a directed verdict and for judgment notwithstanding the verdict or a new trial. We affirm the judgment of the District Court.

On appeal, the plaintiff's primary contention concerns the submission of the defendant's second defense to the jury. That defense involved two assertions: (1) That the plaintiff violated Palmer's instructions relative to liquidating his account if it became undermargined; and (2) that the plaintiff violated certain exchange rules.

"It is a broker's duty to execute his principal's orders in conformity with the authority conferred on him and in compliance with his principal's instructions * * *." 12 C. J. S., Brokers, § 25, p. 68. See, also, 12 Am. Jur. 2d, Brokers, § 83, pp. 835, 836; B. C. Christopher & Co. v. Danker, 196 Neb. 518, 244 N. W. 2d 79 (1976).

The defendant testified that before he bought his first contract, he told E. Warren Bedell, the plaintiff's employee, that "If it ever gets into deficit, you sell it," and "I will never under any circumstances put up any margin money." By deficit, the defendant testified he meant, "If this contract that we had bought, if the thing went against us and went down, he was to sell it and get out of it; I would not put up any more money."

The defendant testified that after July 1, 1973, he had almost daily conversations with Mr. Bedell concerning margin calls. He stated: "I would tell him that I couldn't afford to lose any more than the $3,000 that I had originally told him that I could probably commit to the market; and if my account ever got into any

kind of problems, to blow me out of it, I didn't want any — I couldn't afford any losses, any more than the three." He told Bedell that he would "never meet a margin call, never," and instructed Bedell to liquidate any contracts necessary to meet a margin call. He testified that if he had known his account was in a deficit position, he would never have stayed in the market.

E. Warren Bedell, plaintiff's account executive, testified that the defendant promised to send money to meet margin calls, and always agreed to bring in money that was needed. Bedell could not remember whether or not the defendant ever requested him to liquidate a position to cover a margin call.

Thomas J. Vaughn, a senior vice president for the plaintiff, testified that the defendant had met a margin call. However, when pressed on cross-examination, Vaughn could not state for sure that the cash deposited by the defendant to his account was sent in by the defendant as a response to margin calls issued by the plaintiff - that the defendant intended the money he sent in be used to meet his outstanding margin call at the time.

The record shows that the defendant deposited $1,200 with the plaintiff on June 7, 1973; $1,000 on June 28, 1973; and $1,000 on July 5, 1973. On August 10, 1973, the defendant deposited another $2,000 with the plaintiff. The defendant testified that he added the last $2,000 at the urging of Mr. McClung, another of the plaintiff's employees. He testified that the $2,000 was money he had made that summer.

The record shows also that the defendant received his first margin call from the plaintiff on June 11, 1973, and that his account was undermargined most of the time his account with the plaintiff was open.

"In determining whether a motion for judgment notwithstanding the verdict should have been sustained, the evidence must be considered in the light most favorable to the party who obtained the verdict. Every con-

troverted fact must be resolved in his favor and he is entitled to the benefit of every reasonable inference that may be drawn therefrom. * * * The verdict of a jury based upon conflicting evidence will not be set aside unless it is clearly wrong." Department of Banking v. Colburn, 188 Neb. 500, 198 N. W. 2d 69 (1972).

There was sufficient evidence for the jury to have concluded that the plaintiff failed to follow the instructions given to it by the defendant, and for it to determine that had the defendant's account been closed out within a reasonable time after it became initially undermargined that the defendant would not have sustained the loss he did.

The second part of the defendant's second defense alleged that the plaintiff violated certain exchange rules in the handling of the defendant's account.

The customer's agreement, prepared by the plaintiff and signed by the defendant provided: "1. All transactions under this agreement shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed by you or your agents, and, where applicable, to the provisions of the Securities Exchange Act of 1934, the Commodities Exchange Act, and present and future acts and amendatory thereof and supplemental thereto, and the rules and regulations of the Federal Securities and Exchange Commission, the Board of Governors of the Federal Reserve System and of the Secretary of Agriculture in so far as they may be applicable."

The plaintiff is a clearing member of the Chicago Mercantile Exchange, and a nonclearing member of the Chicago Board of Trade. The defendant's trading in commodities was on these two exchanges.

Mr. Vaughn testified that it is the plaintiff's policy to follow the rules and regulations of the various exchanges on which it deals. He testified that it is the plaintiff's policy to abide by the rules and regulations

of the exchanges concerning margin, and that the plaintiff's policy, in connection with closing out an undermargined account is in accord with exchange rules. Mr. Vaughn testified that the rules of the Chicago Mercantile Exchange and the Chicago Board of Trade applied to the plaintiff, and that the plaintiff in the customer's agreement agreed to abide by the exchange rules.

At the trial, various exchange rules were placed into evidence. Rule 928 c of the Chicago Mercantile Exchange provides: "* * * whenever a customer's margins are depleted below the minimum amount required, the clearing member must call for such additional margins as will bring the account up to initial margin requirements, and if within a reasonable time the customer fails to comply with such demand (except for unusual circumstances the clearing member may deem one hour to be a reasonable time), the clearing member must close out the customer's trades or sufficient thereof to restore the customer's account to required margin status."

This rule provides that whenever a customer's account becomes undermargined, the clearing member must issue a margin call, and if this is not complied with in a reasonable time either close out the account, or else liquidate a portion of it to restore the required margin.

Rule 210 of the Chicago Board of Trade provides: "No member may accept or carry an account for a customer, whether a member or non-member, without proper and adequate margin. The Board, by regulation, shall fix minimum margin requirements." This rule prohibits the carrying of undermargined accounts by members of the Chicago Board of Trade.

Instruction No. 5, given by the trial court to the jury reads in part as follows: "Exchange rules have been received in evidence concerning margins required to be maintained by customers. In this connection you are instructed that the rules require only that margin de-

mands are required to be met within a reasonable time, and that a reasonable time is not any fixed number of hours or days but is a determination that is required to be reasonably made by the broker under all the facts and circumstances then known by him or which he reasonably ought to have known, as reflected in the evidence.

"Likewise, with regard to the closing out of a customer's account for failure of the customer to maintain an adequate margin. In this connection, the broker is required to liquidate the account within a reasonable period of time which, again, is not any fixed or predetermined number of hours or days, but is that period of time reasonably determined by the broker under all the facts and circumstances then known by him or which he reasonably ought to have known, as reflected in the evidence.

"In either event, the broker is required to act with due regard to the customer involved, as one of the circumstances; but in neither event are post-judgment facts (as distinguished from pre-judgment reasonable expectations or concerns) to be considered."

It was proper for the court to submit to the jury the issue of whether the plaintiff violated certain applicable exchange rules. The plaintiff in its agreement specifically represented and agreed that it would follow exchange rules. Failure to follow these rules was thus a breach of the plaintiff's contractual duty owed the defendant. It is axiomatic that the plaintiff cannot recover from the defendant for losses caused by its own breach of contract.

A factual issue was presented to the jury: Whether the plaintiff closed out the defendant's undermargined account within a reasonable length of time, thereby grossly aggravating the defendant's losses.

Mr. Vaughn testified that, "* * * the whole name of the game is knowing the customer * * *," concerning the closing out of undermargined accounts. He testified

that one factor taken into account is the customer's past practice of meeting margin calls. He testified that the defendant's account was closed because the plaintiff was fearful that the defendant was not going to come up with the money.

Sandra Sturges, the assistant manager of the commodity department for the plaintiff at the time of the transactions involved here, testified that she reviewed the defendant's account before it was closed, and that, in her opinion, the plaintiff acted reasonably in allowing the defendant's account to remain open as long as it did. She testified that she never reviewed any financial statement from the defendant.

Mr. Bedell testified that the plaintiff never requested a financial statement from the defendant. He stated that he did not recall any conversation in which the defendant told him what his financial condition was and what he thought he could lose. The defendant testified that he told Bedell that he could only afford to lose $3,000.

There was sufficient evidence for the jury to conclude that the plaintiff kept the defendant's account open an unreasonable length of time after it became undermargined.

The plaintiff contends that instruction No. 5 is erroneous in that it tended to indicate certain exchange rules were applicable to all transactions which took place between the plaintiff and the defendant. Instructions to the jury should be considered as a whole, and if they fairly submit the case, they are not erroneous. Hadenfeldt v. State Farm Mut. Auto. Ins. Co., 195 Neb. 578, 239 N. W. 2d 499 (1976); Duling v. Berryman, 193 Neb. 409, 227 N. W. 2d 584 (1975). When instruction No. 5 is considered along with instruction No. 7 and instruction No. 10, we feel that the instructions as a whole make it adequately clear that violations of exchange rules can only be considered regarding trans-

actions occurring on the exchange whose rules are violated.

There was no error by the District Court in giving instructions Nos. 5 and 7 to the jury, which thereby submitted the defendant's second defense to the jury, and as reviewed above, there was sufficient evidence for the jury to find in favor of the defendant on the basis of that defense.

The plaintiff contends that the defendant, as a matter of law, abandoned his original instructions to his broker, and that the defendant, as a matter of law, ratified, approved, and acquiesced in the plaintiff's handling of the defendant's account.

The defendant testified that he received all monthly statements, daily statements, margin requests, and confirmations. He testified that he never paid too much attention to these documents. The defendant indicated that he did not understand some of these documents.

The defendant testified that whenever he received a margin call, he would contact Mr. Bedell, who would tell him that the market went in his favor and that there was no need to send in any margin money. The defendant testified that he did not keep a daily record of how he was doing on the market, instead, he relied on Mr. Bedell to keep him informed. He testified that when Mr. Bedell went on vacation during August 1973, he received a telephone call from him, and was told by Bedell that Bedell had called Lincoln and that everything looked good.

There was evidence that the defendant was in the plaintiff's office almost every day during the period that he traded with the plaintiff. He stated that he went to the plaintiff's office because he was concerned about how his account was doing.

The defendant testified that he never objected in writing to the plaintiff concerning any trade or account balance; nor did he give any orders to sell out his account, although he knew how to fill out sell orders.

The defendant testified that he wrote out at least one order himself and handed it directly to the wire room, about the time that Mr. Bedell went on vacation, under Mr. McClung's direction. He testified that, under the direction of Mr. Bedell, he filled out more than one sell order. He stated that Mr. Bedell showed him how to fill out orders before he left on vacation, and that Mr. Bedell left him several blank slips with the broker's number and his account number filled in by Bedell.

The defendant testified that he instructed the plaintiff through its agent, Mr. Bedell, that he could not afford to lose over $3,000, which was what he could commit to the market. The record shows that the defendant actually put in $5,200 to his account, including $2,000 on August 10, 1973. He testified that this last investment was made at the suggestion of Mr. McClung, with money he had earned over the summer. The defendant stated that he always bought on the suggestion of the plaintiff's agents, either Mr. Bedell or Mr. McClung.

The issue of ratification and approval of the plaintiff's handling of the defendant's account was submitted to the jury. It is apparent that the jury, in returning a verdict in the defendant's favor, concluded that he did not ratify, approve, or acquiesce in the plaintiff's handling of his account. "To justify this court in interfering with the findings of a jury on a fact question, the preponderance of the evidence must be so clearly and obviously contrary to the findings that it is the duty of the reviewing court to correct the mistake." Dort v. Swift & Co., 193 Neb. 606, 228 N. W. 2d 588 (1975). We cannot say, based on our review of the record, that the jury's determination that there was no ratification was clearly erroneous or manifestly wrong.

The plaintiff also contends that the court should have found for the plaintiff as a matter of law on the basis of paragraphs 7, 9, and 14 of the customer's agreement, which the plaintiff urges control this controversy.

The relevant provisions of paragraph 7 read: "You are hereby authorized in your discretion * * * (c) should margins, in your judgment, be insufficient for your protection, or (d) upon my failure fully to respond to any margin call made by you, to sell any or all of the securities and commodities or other property which may be in your possession, * * *. Such sale, purchase or cancellation may be made according to your judgment and may be made, at your discretion, on the exchange or other market where such business is then usually transacted, * * * and the undersigned shall remain liable for any deficiency * * *."

The relevant portion of paragraph 9 states: "The undersigned undertakes, at any time upon your demand, to discharge obligations of the undersigned to you, or, in the event of a closing of any account of the undersigned in whole or in part to pay you the deficiency, if any, * * *."

Paragraph 14 of the customer's agreement states: "Reports of the execution of orders and statements of the accounts of the undersigned shall be conclusive if not objected to in writing, the former within two days, and the latter within ten days, after forwarding by you to the undersigned by mail or otherwise."

As shown previously, paragraph 1 of this agreement provides that all transactions undertaken pursuant to it were done subject to various rules and regulations. In construing a written instrument, the court must look to the agreement in its entirety. Mills v. Aetna Ins. Co., 168 Neb. 612, 96 N. W. 2d 721 (1959). In ascertaining the agreement between the parties, the court must, in addition to the written agreement, consider any oral understandings, in this case the defendant's instructions to his broker when he opened his account.

Paragraph 7 merely authorizes the plaintiff to take certain actions if certain events happen. Paragraph 9 requires the undersigned to discharge "obligations." Paragraph 14 appears to be designed primarily for the

purposes of establishing certainty as to the figures. Any interpretation of these three paragraphs which would have the effect of making the customer absolutely liable for any action taken by the plaintiff would be unconscionable. There is no merit to this contention.

The plaintiff also finds error in the District Court's refusal to give instructions Nos. 1 and 2 tendered by the plaintiff. At the trial, the defendant testified that he did not read the customer's agreement, the hedging letter, or the authorization to transfer funds between his nonregulated and regulated accounts, even though he signed these documents. He admitted that he had the opportunity to read the customer's agreement, but did not do so. He stated that he was just handed a bunch of papers which they said had to be signed, and he signed them. He stated that he had no knowledge of what these documents contained, prior to being on the witness stand.

The plaintiff's requested instruction No. 1 reads as follows: "You are instructed that the fact that the Defendant, Mr. Kay Palmer, may have failed to read the documents, including the customer agreement, which he executed with the plaintiff, First Mid America, Inc., should not be considered as relieving him of his obligations nor the consequences which are imposed under the provisions of those documents."

While it is true in Nebraska that, in the absence of fraud, one who does not read a contract before signing it cannot later relieve himself of its burdens; e.g. Abbott v. Abbott, 188 Neb. 61, 195 N. W. 2d 204 (1972), we are of the opinion that under the circumstances the District Court was correct in refusing this instruction. The trial court is not required to give a proffered instruction which unduly emphasizes a part of the evidence in the case. Bowley v. Airport Authority of Omaha, 186 Neb. 292, 182 N. W. 2d 911 (1971). This instruction tended to focus undue attention upon the customer's agreement, whereas the agreement between the

plaintiff and the defendant consisted of both written and oral understandings.

The plaintiff's requested instruction No. 2 sought to instruct the jury that unless it found for the defendant on one of his defenses, he was liable to the plaintiff for $31,329.11 plus 9 percent interest from August 24, 1973. This instruction would have given the impression that the defendant was either liable for everything, or liable for nothing. There was no error in refusing it.

We therefore come to the conclusion that the submission of the case to the jury was proper and that the District Court's determination refusing a directed verdict, refusing a judgment notwithstanding the verdict, or for a new trial was correct, and that submitting the case to the jury was without prejudicial error. In light of these holdings, it becomes unnecessary to consider the cross-appeal or other contentions made by the parties.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.