BLUNT, ELLIS & LOEWI, INCORPO-
RATED, a Corporation, Appellee,

v.

Charles IGRAM, Appellant.

No. 65899.

Supreme Court of Iowa.

May 19, 1982.

Max Putnam, Des Moines, and R. Fred Dumbaugh, Cedar Rapids, for appellant.

Thomas P. Ward, Chicago, Ill., and James F. Pickens of Pickens, Barnes & Abernathy, Cedar Rapids, for appellee.

Considered by LeGRAND, P. J., and McCORMICK, ALLBEE, McGIVERIN, and LARSON, JJ.

ALLBEE, Justice.

This litigation arises. from a dispute growing out of substantial losses sustained by defendant Charles Igram in the commodities futures market. Igram has appealed from judgment against him awarding plaintiff Blunt, Ellis & Loewi, Incorporated (BEL), the sum of $137,542. That sum represents the deficit balance in Igram's commodity account when BEL unilaterally closed the account on August 6, 1979, after five of Igram's checks in the aggregate of $96,600 delivered to BEL to meet margin calls were returned because of insufficient funds. Igram also appeals from the dismissal of his counterclaim, and BEL has cross-appealed asserting that it should have been awarded prejudgment interest.

Igram, a long-time speculator in commodities futures, opened an account at the BEL Cedar Rapids branch office in March 1978. He represented that he had equity in assets worth $1.25 million, and annual income in the range of $80–100,000. No limitations were requested by Igram on either the amount he should be permitted to expose to risk or the losses he was willing to sustain. Igram engaged in only a few futures trades in 1978. Beginning in February 1979, however, Igram became active in trading following employment by BEL of an acquaintance of Igram's, one Michael Langer, who joined BEL's Cedar Rapids office as a registered commodities broker. At Igram's request, his account was switched to Langer, and Igram began heavy speculation in futures traded on the Chicago Board of Trade

and the Chicago Mercantile Exchange. Frequently, Igram's account became undermargined for short intervals, and on eleven occasions prior to the end of June 1979, he deposited new funds by check in response to calls for more margin. Two of those checks were initially dishonored by the drawee bank because of insufficient funds, but each was resubmitted and cleared on the second presentment. Igram's eleven margin deposits totaled $184,000. As the result of trading between February and the end of June 1979, Igram incurred a sizeable loss.

On July 5, 1979, Igram varied his trading pattern. That day he sold extensively, retaining primarily long positions in live cattle contracts, but spread that position by selling short an equal number of live cattle contracts in another month. This action substantially reduced his margin requirement, and the equity in his account, thus having been increased by the liquidations on that day, rose to $137,330. The following day Igram demanded that BEL wire $100,000 from his commodity account to his bank account; BEL complied. At the close of trading on July 6, Igram had an equity credit of $31,670, considerably more than the amount needed to cover the positions he then held.

The next business day, Monday, July 9, Igram took off all of his spreads and returned to his more familiar course of trading, dealing primarily in live cattle and soybean meal contracts. By the following day, his account was undermargined and a call was made for him to meet the margin requirement. During the remaining days of that week Igram took more positions and the undermargined condition of his account increased. Meanwhile, Langer was reminding Igram that he must meet the margin calls being made, and Igram was giving assurances that those calls would be met.

On Monday, July 16, the first of several ultimately dishonored checks was delivered by Igram to BEL to meet margin calls. Having met his margin requirement with a $20,000 check, Igram was permitted to maintain and add to his market positions. Days later, when Igram's check reached his bank, the funds in his account were insufficient to cover the check. Consequently, that bank marked the check "NSF" and returned it to BEL's bank, where it was received on Monday, July 23. Langer, upon being informed of this, asked the bank to resubmit the check as had been successfully done in at least two prior instances. Also on July 16, the market price of live cattle began a decline. That adverse price movement not only reduced Igram's equity, but worsened the undermargined condition of his account.

We need not recount in detail what the evidence discloses of ensuing events; a summary will suffice. By July 25, BEL was demanding $60,000 additional margin. On July 26, Igram wrote and handed Langer two checks of $30,000 each. Late that same day, BEL's bank reported to Langer that the $20,000 check presented to Igram's bank for the second time had again been dishonored. There followed in short order the delivery of a replacement check of $20,000 drawn by Igram upon a different account—a check which he declared to be "as good as gold"—and also Igram's tender of a $16,600 check in response to yet another margin call. After July 26, no additional credit was extended to Igram. His account was then long fifty live cattle contracts and short three soybean oil contracts, and it remained in those positions until liquidation began. Throughout this entire period, Igram appeared daily and spent time at BEL's office during trading hours.

The culmination of these events occurred after the market closed on Thursday, August 2, when BEL learned that all of Igram's checks were being returned dishonored. At that time, Igram's account was in deficit by $47,000, even before reversing credits of $96,600 previously entered for the four dishonored checks. Upon being notified of this, the BEL home office directed that all of Igram's positions were to be liquidated. This directive was modified, however, to permit Igram to benefit from an upward price movement then underway in live cattle futures by putting stop-loss orders under his positions rather than sell-

ing them out immediately. The price rally continued to the closing on August 3, and held during the early trading on Monday, August 6. Later in the Monday session, however, the prices broke downward, hit the stop-loss prices put in the previous week, and Igram's positions were sold out. The account deficit after the sell-out was $40,942. Two days later, the dishonored checks were returned to BEL and debited to Igram's account, thus reflecting Igram's total deficit to be $137,542.

■ Shortly after liquidation was completed, BEL commenced this action. Trial to the court was conducted in July 1980, and judgment was entered on September 22, 1980. This case having been tried to the court, the scope of our review is for correction of errors of law. Iowa R.App.P. 4. We are mindful that trial court's findings of fact have the force of a special verdict, *id.*, and are binding on us if supported by substantial evidence, Iowa R.App.P. 14(f)(1). Evidence reviewed for its substantiality is to be viewed in the light most favorable to the judgment. *E.g., Packwood Elevator Co. v. Heisdorffer*, 260 N.W.2d 543, 544 (Iowa 1977). We are not bound by trial court's determinations of law, however, nor precluded from inquiry into whether trial court applied erroneous rules of law which materially affected its decision. *E.g., Kurtenbach v. TeKippe*, 260 N.W.2d 53, 55 (Iowa 1977).

## I. *Determination of issues presented by Igram's appeal.*

*A.* Igram first insists that BEL is barred from recovering his account deficit because BEL breached the commodity account agreement entered into with Igram by failing either to close the account within a reasonable time after it became undermargined or to liquidate a portion of it to restore the required margin. The commodity account agreement between these parties provided that all transactions were subject to the rules and regulations of the commodity exchanges on which they were executed. The agreement also gave the broker authority to liquidate the account whenever it

deemed the margin deposits inadequate, and further provided that the customer would be liable to the broker for resulting deficiencies.

In support of his assertion that BEL is barred from recovering his account deficit, Igram alleged that BEL violated rules of the commodity exchanges pertaining to undermargined accounts. Specifically, Igram affirmatively pleaded:

> Under Rule 928c of the Chicago Mercantile Exchange, when the customer's margins are depleted below the minimum amount and the customer fails to comply with the demand for more, "the clearing member must close out the customer's trades or sufficient thereof to restore the customer's account to required margin status". Under Rule 210 of the Chicago Board of Trade "No member may accept or carry an account for a customer, whether a member or non-member, without proper and adequate margin". So the Plaintiff herein is precluded from recovering any of the claim made because it is seeking to profit from its own wrong in violating the rules of the Exchange in which it was operating, besides breaching its contract.

It is settled that "[a] broker's covenant with its customer that it will follow exchange rules and customs establishes a contractual duty to the customer." *Iowa Grain v. Farmers Grain and Feed Co.*, 293 N.W.2d 22, 25 (Iowa 1980). Furthermore, the breach of a contractual duty to liquidate an undermargined account has been recognized as a defense to a broker's action on a commodity account. *First Mid America, Inc. v. Palmer*, 197 Neb. 224, 230, 248 N.W.2d 30, 34–35 (1976).

■ Under the evidence in this case, however, we cannot accept Igram's proposition that he is free to repudiate his losses. The record discloses that whenever Igram's account became undermargined, BEL made margin calls; we note that Igram does not contend otherwise. In addition, Igram acknowledges that Langer also kept him informed of when he was undermargined. According to Langer, Igram always gave

assurances that he would comply with margin requirements. The evidence moreover reveals that by his tendering of checks in sums to meet margin calls—checks that eventually proved to be worthless—Igram induced BEL to continue to extend credit to him and not to sell out his open positions. Trial court, we believe, was justified in finding that Igram's actions were designed " 'to buy time' hoping that the market would go up."

Igram's defense here was squarely rejected in similar circumstances in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615 (5th Cir.) (per curiam), *cert. denied*, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977). There an experienced commodity futures investor who knew his account was undermargined was nevertheless permitted by the broker to continue to trade for eighteen days before the broker made a margin call. In fact, the investor was not only aware at all times of the deficiency in his account, he also went to the broker's local office daily to check on his commodities transactions. When sued for the deficiency, the investor contended he should not have to repay the indebtedness because the extension of credit violated an exchange rule. What was said in *Brooks* in dismissing the investor's contention may aptly be applied here:

> To adopt such an argument would permit commodity futures investors to accept extensions of credit from a broker which violate [exchange] rules . . . and repudiate losses that ensue or accept profits that follow. . . . We do not accept this position. . . .

*Id.* at 615–16.

We also note that the circumstances before us are clearly distinguishable from those reported in *Iowa Grain*, 293 N.W.2d at 24, where the trial court found that the customer did not receive a timely margin call when the account became undermargined, and *Palmer*, 197 Neb. at 228, 248 N.W.2d at 33, in which the evidence was determined sufficient for the jury to have concluded that the broker failed to follow the customer's instructions to liquidate any

undermargined position, and for it to also find that had the customer's account been closed out within a reasonable time after it initially became undermargined the customer would not have sustained the loss he did.

Trial court here concluded "[t]here was no duty on the part of [BEL] to liquidate [Igram's] account any sooner than it did under the evidence presented in this case." We agree.

*B.* Next, Igram asserts that "plaintiff violated exchange rules, federal laws, and the common law, which violations of law precluded any judgment for plaintiff in any amount." Igram's brief does not refer us to any rule of either commodity exchange upon which he relies in making the foregoing assertion. Consequently, we are unable to pursue consideration of that facet of his contention. *See McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 184 (Iowa 1980). In addition, the only principle of common law to which our attention is directed is *Ex dolo malo non oritur actio*, meaning no court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. Black's Law Dictionary 509 (rev. 5th ed. 1979). This facile maxim offers no solution to the broad question raised by Igram's assertion.

With respect to his claim of federal law infractions, Igram cites sections of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, as amended, specifically sections 4, 6b(B)(C) and 6d, which he alleges BEL violated. Beneath the surface of this allegation lurks the issue of whether any such violation gives rise to a private action for damages. Until recently, considerable controversy raged on this issue. The question was resolved earlier this month by the United States Supreme Court's 5–4 decision in *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), which held that there is an implied private right to bring a damages action for violation of the Act.

■ In the present case, however, trial court found that there were no federal law violations. We believe that finding was

justified. On examination of the sections cited by Igram, we observe that section 4 simply provides for the liability of the principal for the act of his agent. 7 U.S.C. § 4. This is not, however, a matter in dispute here. Section 6b(B)(C) forbids fraudulent practices in commodities futures transactions by members of a board of trade, 7 U.S.C. § 6b(B)(C), while section 6d prohibits the misuse by brokers of customers' margin deposits, 7 U.S.C. § 6d. In rejecting Igram's defense that BEL violated any of these provisions, trial court determined that BEL's acceptance of Igram's checks to meet margin calls rather than liquidating his account before it did was not in contravention of those statutory provisions. We believe the evidence supports this finding. As earlier stated, Igram does not deny that he received margin calls. His account was kept open and trading permitted only because of assurances he made that margin requirements would be met and his delivery of checks for this purpose. When, on August 2, BEL learned that all of Igram's checks were dishonored and his deception became known, immediate measures were taken to liquidate his account. Liquidation was delayed only to take advantage of an upward price trend and thereby mitigate in some degree Igram's losses. These actions by BEL belie Igram's charges of statutory violations and fraudulent practices. *Cf. Lincoln Commodity Services v. Meade*, 558 F.2d 469, 474 (8th Cir. 1977) (assuming, *arguendo*, violations of exchange *rules* and that such violations give rise to a private cause of action, the violations, if any, were condoned if not instigated by the customer himself and thus he should not be allowed to base a private cause of action on such violations).

Although trial court found that there were no federal law violations, it went further and held that a violation of the Commodity Exchange Act does not give rise to a private action. It was, however, unnecessary for trial court to decide the question, and that conclusion is hereby nullified in light of *Merrill Lynch, Pierce, Fenner & Smith v. Curran*. This, of course, does not require that we disturb trial court's judg-

ment, because we are nonetheless satisfied that it did reach the correct result. *See Citizens First National Bank v. Hoyt*, 297 N.W.2d 329, 332 (Iowa 1980).

*C.* Other contentions urged by Igram attacking both the propriety of the award to BEL and the denial of Igram's counterclaim have been considered and found to lack merit. Moreover, we believe the determinations already reached in this opinion to be dispositive, particularly in light of the intertwining of all of Igram's contentions. Thus we are satisfied that discussion of other contentions is unnecessary.

*D.* Finally, we address Igram's claim that trial court erred in rejecting his demand for trial by jury of issues generated by his amended counterclaim. We note the pleading chronology pertinent to this claim of error. BEL initiated the present action by filing its petition on August 13, 1979. Igram answered on August 31, and thereafter, on September 13, filed an amended answer and a counterclaim. Neither party made a demand for trial by jury. Months later, on June 17, 1980, Igram was granted leave to file a second amended answer and amended counterclaim, which he did that same day. The amended counterclaim contained two counts. BEL filed its reply to the amended counterclaim on July 3. Then, on July 8, the morning trial was to begin, Igram filed a demand for trial by jury of both counts I and II of the amended counterclaim. Following hearing that morning, trial court determined Igram was not entitled to a jury trial on his counterclaim, and trial to the court proceeded.

On appeal, Igram argues that he had a right to have the counterclaim decided by a jury. He points out that his written demand complied with Iowa R.Civ.P. 177(b) in that it was filed within ten days after BEL's reply, the reply being the last pleading directed to the issues raised by the amended counterclaim.

■ The right to a jury trial is, of course, waived unless a written demand is made, as provided in Iowa R.Civ.P. 177. *Schloemer v. Uhlenhopp*, 237 Iowa 279, 280–83, 21

N.W.2d 457, 457–58 (1946). Once waived, the right can be revived, however, by a timely demand limited to *new* issues raised by a proper amendment. *Mills v. Lyon*, 240 N.W.2d 189, 190–91 (Iowa 1976). *Cf. Universal C.I.T. Credit Corp. v. Jones*, 227 N.W.2d 473, 475–76 (Iowa 1975) (where the demand for jury trial after amendment to pleadings is general and not limited, trial court is justified in ruling on the demand as made and need not sort out the issues to see which are triable to a jury and which are not).

■ Our scrutiny of Igram's counterclaim pleadings discloses that Count I of his amended counterclaim raises no new issue. That count is essentially an elaborate recasting of the prior counterclaim. In substance, Count I alleges that BEL improperly failed to liquidate Igram's account on July 6, 1979, and in the alternative, that BEL improperly liquidated the account on August 6, 1979.

Count II of the amended counterclaim asserts that BEL slandered and libeled Igram by alleging in its petition that checks of a face value of $96,600, made and delivered to BEL by Igram, were returned marked "insufficient funds" by the banks upon which the checks were drawn. Igram also alleges in Count II malicious prosecution on the part of BEL in instigating criminal charges against him based upon the bad checks, charges that were dismissed after the grand jury's refusal to return an indictment.

Even if we assume, without deciding, that Count II raised new issues, and if we assume further that it states claims on which relief can be granted, Igram's jury demand did not limit itself to trial by jury of *new* issues engendered by the amended counterclaim. It was a demand for a jury trial on *all* issues raised by *both* counts of the counterclaim; we assume here, as we did under similar circumstances in *Universal C.I.T.*, that trial court considered it as such. *See id.* at 475. Furthermore, the record made at the hearing following filing of the demand does not reflect any indication by Igram that he was asking for any-

thing less than a jury trial on both counts. Under this record we cannot say trial court erred. It was justified in ruling on the request as made. It was not required to comb Igram's pleadings to ascertain whether any issues were triable to a jury. *Id.* at 476.

## II. *BEL's cross-appeal.*

BEL contends that trial court erred in not awarding prejudgment interest. Following entry of judgment, BEL filed a motion for modification of the judgment to include the grant of specified prejudgment interest. Trial court never ruled on the motion.

■ A motion not ruled upon in the trial court presents nothing for appellate review. *E.g.*, *Fetters v. Degnan*, 250 N.W.2d 25, 31 (Iowa 1977). The burden of demanding a ruling rests with the party desiring it. *Id.* Thus, "a party cannot predicate error on a trial court's failure to rule when he has made no request or demand for ruling." *State v. Pelelo*, 247 N.W.2d 221, 226 (Iowa 1976). A failure to obtain a ruling cannot be excused unless the court refuses or fails to rule after a ruling is demanded. *See Linge v. Ralston Purina Co.*, 293 N.W.2d 191, 195 (Iowa 1980).

■ We do not find, nor does BEL contend, that trial court refused or failed to rule on the motion after a demand to do so. We also note that once this appeal was taken by Igram, BEL did not seek from this court a limited remand for the specific purpose of obtaining a trial court ruling on the motion. *See* Iowa R.App.P. 12(g). BEL simply cross-appealed. Consequently, no error was preserved.

AFFIRMED ON APPEAL AND CROSS–APPEAL.