In the Interest of B.G.C., A Child,

C.C., Natural Mother, Appellant.

In the Interest of B.G.C., D.O.B.:
02–08–91, A Minor Child,

R.D. and J.D., Appellants.

D.S., Intervenor–Appellee.

Nos. 91–476, 92–49.

Supreme Court of Iowa.

Sept. 23, 1992.

As Corrected Oct. 15, 1992.

Rehearing and Stay Denied Nov. 20, 1992.

As Revised May 17, 1993.

Jacqueline Miller of Dolezal, Miller & Garrels, Cedar Rapids, for C.C. and D.S.

Gary L. Robinson of Klinger, Robinson, McCuskey & Ford, Cedar Rapids, for R.D. and J.D.

Richard Boresi of King, Smith & Boresi, Cedar Rapids, guardian ad litem for B.G.C.

M. Kathryn Miller and Onita Mohr, Des Moines, and Leticia L. Valdes, Legal Intern, for amicus curiae Youth Law Center.

LARSON, Justice.

This case is, we observe thankfully, an unusual one. It involves the future of a baby girl, B.G.C., who was born on February 8, 1991. Her mother, Cara, who was not married, decided to give up the baby for adoption and signed a release of parental rights as provided by Iowa Code section

600A.4 (1991). She named "Scott" as the father of the baby, and Scott signed a release of parental rights. Later, both Cara and Scott signed waivers of notice of the termination hearing. After the hearing, the court ordered the termination of the parental rights of both Cara and Scott. Custody of the child was given to the potential adoptive parents, R.D. and J.D.

Cara moved to set aside the termination, asserting that her release was defective for several reasons. She also asserted, for the first time, that the real father was "Daniel," not Scott. She informed Daniel that he was the father of her child, and Daniel intervened in the adoption proceeding to assert his parental rights. The juvenile court denied Cara's motion to set aside the termination of her parental rights, and she appealed.

In the meantime, the adoption case proceeded. The district court found that Daniel was in fact the real father, that he had not released his parental rights, and that he had not abandoned the baby. The court denied the adoption and ordered the baby to be surrendered to Daniel. R.D. and J.D. appealed and obtained a stay of the district court's order transferring custody. The baby has remained in the custody of R.D. and J.D. virtually from the time of her birth.

The court of appeals reversed the termination of Cara's parental rights and remanded the case to the juvenile court. We granted further review of that decision and consolidated it with R.D. and J.D.'s appeal in the adoption case.

We agree with the court of appeals that the juvenile court had jurisdiction to rule on Cara's motion to vacate the order terminating her parental rights and conclude that the court erred in refusing to resolve the motions on their merits. The termination case must therefore be remanded for further proceedings. We agree with the district court in the adoption case that Daniel proved he was the father, that he had not abandoned the baby, and that the adoption proceeding was therefore fatally flawed. Custody of the baby is ordered to be transferred to Daniel.

■ As tempting as it is to resolve this highly emotional issue with one's heart, we do not have the unbridled discretion of a Solomon. Ours is a system of law, and adoptions are solely creatures of statute. As the district court noted, without established procedures to guide courts in such matters, they would "be engaged in uncontrolled social engineering." This is not permitted under our law; "[c]ourts are not free to take children from parents simply by deciding another home offers more advantages." *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977).[1] We point out that this case does not invalidate an adoption decree. Adoption of the baby was denied by the district court because the father's rights were not terminated.

### I. Termination of Cara's Parental Rights.

Under Iowa Code section 600.3(2),

[a]n adoption petition shall not be filed until a termination of parental rights has been accomplished except in the following cases:

---

1. It has been urged that the court should uphold this proposed adoption on the ground that the father had abandoned his rights by failing to protect them, beginning at the time the pregnancy became known. In other words, it is suggested that this father should have acted to protect his parental rights immediately when the pregnancy became known, even though he had no indication from her that he was the father and even though she was dating another man at the time. This, of course, is totally unrealistic; it would require a potential father to become involved in the pregnancy on the mere speculation that he might be the father because he was one of the men having sexual relations with her at the time in question.

Iowa Code § 600A.8 requires that abandonment be shown by clear and convincing evidence. To hold that Daniel's action was required immediately on knowledge of the pregnancy, at the risk of losing his parental rights, would fly in the face of that standard. These facts would fall far short of clear and convincing evidence. More important, a finding of abandonment under these circumstances would deprive a father of a meaningful right, protected by the Constitution, to develop a parent-child relationship.

*a.* No termination of parental rights is required if the person to be adopted is an adult.

*b.* If the stepparent of the child to be adopted is the adoption petitioner, the parent-child relationship between the child and the parent who is not the spouse of the petitioner may be terminated as part of the adoption proceeding by the filing of that parent's consent to the adoption.

The adoption petition alleged that the parental rights of Cara and Scott had been terminated, although, of course, it did not allege the termination of Daniel's parental rights because he was not identified as the father at that time.

Cara's motion to vacate her release of custody asserted that the release was procured by fraud, coercion, and misrepresentations of material fact. *See* Iowa Code § 600A.4(4). She also alleged that she had "good cause" for revocation, *id.,* because the release was obtained less than seventy-two hours following the birth. *See* Iowa Code § 600A.4(2)(d). Moreover, she contends, if Iowa Code chapter 600A is interpreted to allow this termination to stand, it is unconstitutional.

The juvenile court did not pass on the merits of Cara's motion, concluding that it lacked jurisdiction because a petition for adoption had been filed at the time Cara filed her posttrial motions. *See* Iowa Code § 600A.9(2). That raises the first issue.

A. *Juvenile court jurisdiction.* Section 600A.9(2) provides:

If an order is issued [terminating parental rights], the juvenile court shall retain jurisdiction to change a guardian or custodian and to allow a terminated parent to request vacation of the termination order *if the child is not on placement for adoption or a petition for adoption of the child is not on file.* The juvenile court shall grant the vacation request only if it is in the best interest of the child.

(Emphasis added.)

Considering the substance of Cara's "Request to Revoke Release of Custody or Vacate Orders," we consider it as a motion for new trial. *See Kagin's Numismatic Auctions v. Criswell,* 284 N.W.2d 224, 226 (Iowa 1979) ("We look to the substance of a motion and not to its name...."). Cara's motion was filed within the ten days provided by Iowa Rule of Civil Procedure 247 for the filing of posttrial motions. Nevertheless, R.D. and J.D. argue, filing of the adoption petition precluded the court's jurisdiction because of the emphasized language of section 600A.9(2).

Under this interpretation of section 600A.9(2), a natural parent would have no remedy in juvenile court to set aside termination orders, even those based on fraud or coercion, if prospective adoptive parents immediately file an adoption petition. That, in fact, is what happened in this case; the order terminating Cara's parental rights and the petition for adoption were filed simultaneously.

This court routinely remands cases in which a notice of appeal is filed, prematurely, while posttrial motions are pending. *See, e.g., Blunt, Ellis & Loewi, Inc. v. Igram,* 319 N.W.2d 189, 195 (Iowa 1982); *Loudon v. Hill,* 286 N.W.2d 189, 192 (Iowa 1979). *See generally* Iowa R.App.P. 12(g).

Section 600A.7(1) provides that termination hearings shall be conducted in accordance with our rules of civil procedure, and under rule 247, a party has ten days to file a posttrial motion.

We believe section 600A.9(2) was intended to preserve juvenile court jurisdiction, not to deny a parent the right to challenge a termination by posttrial motions. Motions for new trial are necessarily to be resolved, in the first instance, by the trial court, and an adoption petitioner should not be allowed to avoid such a remedy by filing a petition for adoption immediately on receipt of a termination order.

In interpreting a statute, one of the considerations is the practical effects of a particular interpretation. If the filing of an adoption petition divests the juvenile court of jurisdiction to rule on new-trial motions, this would normally require an appeal to this court and a limited remand back to the juvenile court to rule on the pending mo-

tions. This time-consuming process would be counterproductive in custody cases, which are entitled to disposition on a priority basis. We do not attribute such an intent to the legislature in enacting section 600A.9(2).

*In re Adoption of M.M.B.*, 376 N.W.2d 900, 902 (Iowa 1985), must be distinguished because that case did not involve a challenge to the termination order within the ten days provided by rule 247. In that case, the adoption petition had been filed, and the ten days following the order in question had expired. In fact, *M.M.B.* suggests that the juvenile court's jurisdiction would not be lost under the circumstances of the present case, noting that the parent in that case made no claim of fraud in the termination. 376 N.W.2d at 902. We do have a claim of fraud in the present case.

We agree with the court of appeals that the juvenile court did not lose jurisdiction to rule on Cara's posttrial motions.

B. *Interpretation of section 600A.4.* Under section 600A.4(2),

[a] release of custody:

. . . .

*d.* Shall be signed, *not less than seventy-two hours after the birth of the child to be released,* by all living parents.

(Emphasis added.)

It is undisputed that Cara's release did not satisfy the seventy-two-hour requirement of section 600A.4(2)(d); it was signed only about forty hours after the baby's birth. Cara argues that the release is therefore invalid. R.D. and J.D. counter that a seventy-two-hour waiting period was not required because of this language of the subsection that follows in section 600A.4:

3. *Notwithstanding the provisions of subsection 2,* an agency or a person making an independent placement may assume custody of a minor child upon the signature of the one living parent who has possession of the minor child if the agency or a person making an independent placement immediately petitions the juvenile court designated in section 600A.5 to be appointed custodian and

otherwise petitions, either in the same petition or within a reasonable time in a separate petition, for termination of parental rights under section 600A.5. Upon the custody petition, the juvenile court may appoint a guardian as well as a custodian.

(Emphasis added.)

Again, the statute is not clear. Does section 600A.4(3) abrogate all of the requirements for the execution of a release set out in subsection 2? If so, the statute would legalize a release made directly to potential adoptive parents, thus bypassing an agency or independent placement agent (required by subparagraphs *a* and *b*). It would also authorize an oral release despite the requirements of subsection *c* that it be in writing; and it would legalize a release immediately on birth, despite the seventy-two-hour requirement of subsection *d.*

■ We believe that subsection 3, by streamlining the procedure for obtaining custody, simply allows a person to be granted temporary custody without following all of the requirements of subsection 2, and without the necessity of seeking out absent, and perhaps unknown, fathers. Granting of temporary custody without the formal requirements of subsection 2, however, does not amount to a release of parental rights. Such a release is still required to follow the formal requirements of section 600A.4(2).

■ We do not suggest that a mother cannot waive the seventy-two-hour requirement of section 600A.4(2) or the other formalities included in that statute. R.D. and J.D. claim that Cara did so in this case by signing the release and by waiving her right to appear at the termination hearing. Cara disputes that she voluntarily relinquished any rights. She contends, for example, that she was unaware that the law required a seventy-two-hour waiting period before the release, and she could not therefore have voluntarily waived it. R.D. and J.D. point out that such advice is not required by the statute.

Waiver is generally a fact question, but the juvenile court made no findings with

respect to Cara's claim of fraud and improper execution of the release, or on R.D. and J.D.'s claim of waiver, because it concluded that it lacked subject matter jurisdiction. We have discussed this issue earlier in this division and have concluded that the juvenile court in fact did have jurisdiction to rule on Cara's posttrial motions.

We agree with the court of appeals that the case should be remanded to the juvenile court for its ruling on the combined motions by Cara to set aside the termination order and to revoke her consent, as well as on R.D. and J.D.'s claim of waiver. We discuss the law applicable to the termination case for the benefit of the juvenile court in its further proceedings.

C. *The constitutional argument.* Cara argues that chapter 600A is unconstitutional because it denied her due process.

The interest of parents in their relationship with their children is a fundamental liberty interest protected by the Fourteenth Amendment. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (state "must provide the parents with fundamentally fair procedures [in termination cases]").

██ Our statutes are accorded a strong presumption of constitutionality, *Heritage Cablevision v. Marion County Bd. of Supervisors,* 436 N.W.2d 37, 38 (Iowa 1989); and the burden of proving the contrary beyond a reasonable doubt is on the party challenging it. *Id.*

Once it is determined that due process applies, the question becomes what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484, 494 (1972).

██ Section 600A.7 requires that the hearing on termination shall be conducted in accordance with the provisions of Iowa Code sections 232.91 to 232.96 and "otherwise in accordance with the rules of civil procedure." Section 232.94 requires that a stenographic, electronic, or mechanical recording shall be made of all court proceedings unless waived by the parties. Section 232.96(2) places the burden of proof on the state by clear and convincing evidence. In addition, only evidence that is admissible under the rules of evidence applicable to the trial of civil cases shall be admitted except as otherwise specifically provided. Iowa Code § 232.96(3).

The termination statute itself provides additional safeguards. Section 600A.4(2) requires that a release of custody (a) be accepted only by an agency or a person making an independent placement; (b) shall not be accepted by a person who in any way intends to adopt the child who is the subject of the release; (c) shall be in writing; (d) shall be signed not less than seventy-two hours after the birth of the child; and (e) shall be witnessed by two persons familiar with the parent-child relationship. In addition, section 600A.4(h) requires that the release shall "state the purpose of the release, shall indicate that if it is not revoked it may be grounds for termination, and shall fully inform the signing parent of the manner in which a revocation of the release may be sought."

It is true, as R.D. and J.D. point out, that the statute does not require that the signing party be "fully informed," nor does it require that the parent be advised that no release of custody is valid if obtained within seventy-two hours of the birth. While these factors bear upon the voluntariness of a release, the failure of chapters 232 and 600A to specifically include those requirements does not render the statute unconstitutional in view of the other safeguards provided.

We conclude that chapter 600A.3 provides all of the process due under the Fourteenth Amendment and therefore reject Cara's constitutional challenge.

II. *The Adoption Case.*

R.D. and J.D., as prospective adoptive parents petitioned to terminate the parental rights of Daniel, the "second" father. The district court heard the petition for termination in conjunction with its hearing on the petition for adoption. The district court therefore acted in a joint role as juvenile court and district court. According to the order of Judge Kilburg, the adoption proceedings by J.D. and R.D. were fatally defective because Daniel es-

tablished that he was the real father and his rights had not been terminated as required by Iowa Code section 600.3(2) ("An adoption petition shall not be filed until a termination of parental rights has been accomplished except [in adoptions of adults and stepchildren]."). The court concluded that the ground of abandonment had not been established and that the adoption petition must therefore be denied.

R.D. and J.D. challenge this ruling on the grounds that (1) the best interests of the child dictate that she remain with R.D. and J.D., (2) Daniel did not prove his paternity, and (3) he had abandoned the baby.

A. *Best interests of the child.* The argument that the best interests of the baby are best served by allowing her to stay with R.D. and J.D. is a very alluring argument. Daniel has had a poor performance record as a parent. He fathered two children prior to this child, a son, age fourteen, and a daughter born out of wedlock, now age twelve. The record shows that Daniel has largely failed to support these children financially and has failed to maintain meaningful contact with either of them.

In contrast, as the district court found, R.D. and J.D. "have provided exemplary care for the child [and] view themselves as the parents of this child in every respect."

What R.D. and J.D. ask us to do, however, is to bypass the termination requirements of chapter 600A and order the granting of the adoption without establishment of any of the grounds for termination specified in section 600A.8 because it would be in the baby's best interest.

Their argument is that, although Daniel was not a party to the original termination hearing under chapter 600A (in which Scott was named as father), his rights could, and should, have been terminated by the court in the chapter 600 adoption proceeding. Under chapter 600, they argue, specific grounds for termination need not be established; the best interest of the child determines the issue of termination in an adoption case. We do not believe that our law is capable of this interpretation. Whatever our adoption law was prior to 1976, it is clear that since 1976 termination of paren-

tal rights "shall be accomplished only according to the provisions of this division [now chapter 600A]." 1976 Iowa Acts ch. 1229, § 3 (now Iowa Code § 600A.3).

The intention of the legislature to link the termination provisions of chapter 600 and 600A is apparent from the fact that the same 1976 Act that made chapter 600A the exclusive vehicle for termination also amended the adoption statute, ch. 600, to require a termination of parental rights prior to the filing of an adoption petition. 1976 Iowa Acts ch. 1229, § 12 (now codified in Iowa Code § 600.3(2)).

The general rule is that

[t]he state cannot interfere with the rights of natural parents simply to better the moral and temporal welfare of the child as against an unoffending parent, and, as a general rule, the court may not consider whether the adoption will be for the welfare and best interests of the child where the parents have not consented to an adoption or the conditions which obviate the necessity of their consent do not exist. However, where a parent by his conduct forfeits the right to withhold consent, but nevertheless contests the adoption, the welfare of the child is the paramount issue.

2 C.J.S. *Adoption of Persons* § 67, at 491 (1972).

■■■ Our case law is in accord with this view; statutory grounds for termination must be established in addition to establishing the child's best interests in order to terminate. *In re L.H.,* 480 N.W.2d 43, 47 (Iowa 1992); *In re B.L.A.,* 357 N.W.2d 20, 23 (Iowa 1984).

We agree with the district court that under section 600.3(2) parental rights may not be terminated solely on consideration of the child's best interest but that specific grounds for termination under chapter 600A must also be established. Daniel's parental rights had not been terminated, and the adoption proceedings were therefore fatally flawed.

B. *Paternity.* R.D. and J.D. argue that Daniel should not have prevailed in the adoption case because he failed to establish

his paternity. As already noted, Cara initially named Scott as the baby's father. She says the reason for her false information was that she was dating Scott at the time she found out that she was pregnant, and she did not want to create problems by appearing to have another man's baby.

Paternity must be shown by a preponderance of the evidence. *In re Marriage of Schneckloth*, 320 N.W.2d 535, 536 (Iowa 1982); *Moody v. Christiansen*, 306 N.W.2d 775, 777 (Iowa 1981). Within days after Cara signed her release she stated in an affidavit supporting her motion to vacate the termination that Daniel, not Scott, was the father. This was supported by blood tests, which showed a 99.99% probability that Daniel was the father and a 0% chance that Scott was the father.

We agree with the district court that, based largely on the result of the blood tests, Daniel proved by a preponderance of the evidence that he is the father of the baby.

C. *Abandonment.* R.D. and J.D. contend that the court should have terminated the parental rights of Daniel on the ground that he had abandoned the child (one of the grounds for termination under chapter 600A). We agree with the district court that the evidence falls short of establishing abandonment.

While it is true that Daniel has not shared in any of the expenses in connection with the birth, he was never requested to do so. Nor was there any need to pay the expenses until he learned that the child was his. Abandonment is defined as the relinquishment or surrendering of parental rights and includes both the intention to abandon and the acts by which the intention is evidenced. Iowa Code § 600A.2(16). Abandonment is said to be a relinquishment of parental rights and responsibilities with an intent to forego them. *In re Goettsche*, 311 N.W.2d 104, 105 (Iowa 1981).

Abandonment must be shown by clear and convincing proof. Iowa Code § 600A.9. In this case, the mother informed Daniel on February 27, 1991, that she suspected that Daniel was the father. Daniel, a truck driver, was due to leave town the next day with his truck and asked the mother to see what she could do to "retrieve" the baby. Daniel testified that the mother called him while he was on the road trip and told him that she had located an attorney who would take the case. The next Saturday, ten days after he learned that the mother thought he was the father, Daniel met with the attorney to discuss how he might assert his parental rights. He still did not know for sure that he was the father because the blood tests that ultimately confirmed that fact came later. Nevertheless, he immediately filed a request to vacate the termination order on March 12, 1991, and an affidavit on March 18, 1991. He then filed his petition to intervene in the adoption case on March 27, 1991, one month after he first learned that he might be the father.

We agree with the district court that abandonment was not established by clear and convincing evidence. In fact, virtually all of the evidence regarding Daniel's intent regarding this baby suggests just the opposite: Daniel did everything he could reasonably do to assert his parental rights, beginning even before he actually knew that he was the father.

III. *Conclusion.*

We empathize with the district court, which observed that:

> The court had an opportunity to observe [R.D. and J.D.] at the time of hearing and the court is under no illusion that this tragic case is other than an unbelievably traumatic event.... While cognizant of the heartache which this decision will ultimately cause, this court is presented with no other option than that dictated by the law in this state. Purely equitable principles cannot be substituted for well-established principles of law.

The parental rights of this father may not be dismissed without compliance with our termination statute, and the court correctly ordered that the petition for adoption be dismissed. We therefore affirm the adoption case.

In the termination case, we affirm the decision of the court of appeals, reversing

the order of the juvenile court, and remanding for further proceedings in respect to the posttrial motions filed by Cara.

In termination case, No. 91–476, DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT OF JUVENILE COURT REVERSED; REMANDED FOR FURTHER PROCEEDINGS. In adoption case, No. 92–49, JUDGMENT OF DISTRICT COURT AFFIRMED.

SNELL, Justice, dissenting.

I respectfully dissent.

The evidence is sufficient to show abandonment of the baby by Daniel. The record shows he has previously failed to raise or support his other two children. He quit supporting his son, born in 1976, after two years. From 1978 to 1990 he saw him three times. He has another daughter whom he has never seen and has failed to support. He stated he just never took any interest in her. In every meaningful way, he abandoned them.

Daniel knew that Cara was pregnant in December 1990. He saw her in the building where they worked for the same employer. The child was born in February 1991. Having knowledge of the facts that support the likelihood that he was the biological father, nevertheless, he did nothing to protect his rights. The mother, Cara, who knew better than anyone who the father was, named Scott as the father. The legal proceedings logically and reasonably were based on these representations. The termination of parental rights as known to exist at the time were legally completed and an adoption process was commenced.

Daniel's sudden desire to assume parental responsibilities is a late claim to assumed rights that he forfeited by his indifferent conduct to the fate of Cara and her child. The specter of newly named genetic fathers, upsetting adoptions, perhaps years later, is an unconscionable result. Such a consequence is not driven by the language of our statutes, due process concerns or the facts of this case.

I would remand for termination of Daniel's parental rights based on abandonment and denial of Cara's motions. The intervention petition of Daniel in the adoption case should be dismissed on remand and the adoption proceed.