641 So.2d 84 (1993)
Trinity Ann HENRIQUEZ, et al., Appellant,
v.
The ADOPTION CENTRE, INC., Appellee.
Nos. 93-173, 93-446.
District Court of Appeal of Florida, Fifth District.
August 27, 1993.
Opinion on Rehearing July 18, 1994.
Debra A. Lamm, Maitland, for appellants.
Dorothy J. McMichen of Phillips & McMichen, P.A., Orlando, for appellee.
Opinion on Rehearing En Banc July 18, 1994.
PER CURIAM.
AFFIRMED.
GRIFFIN and DIAMANTIS, JJ., concur.
HARRIS, C.J., dissents with opinion.
*85 HARRIS, Chief Judge, dissenting:
Trinity Henriquez (Trinity) gave birth to a son on January 2, 1992. She and her son lived with her boyfriend up until about September 2, 1992, when a blood test (apparently required by HRS) determined that her boyfriend was not the father of her child. Her boyfriend then became upset and returned Trinity and her child to her parents' home. Her parents were out of town.
Feeling alone and scared, abandoned and unable to support her child, she called the Adoption Centre. The Adoption Centre immediately sent a taxi to pick up Trinity and her child. In a short period of time (at one sitting) she signed the waiver of her parental rights and her consent for adoption. She was sent home by taxi.
Five days later, after her parents returned and assured her of their continued support (the grandparents, after all, had also created a bonding relationship with the child during the eight months it had lived with their daughter) and after her boyfriend acknowledged his commitment to the child, she notified the Adoption Centre that she wished to withdraw her waiver and consent and have her child returned. The Adoption Centre refused her request and instead filed a petition for dependency and termination of parental rights.
It is significant that the Adoption Centre's only allegations to justify the dependency and termination of parental rights action were that:
1. the mother had signed the waiver and consent; and
2. the father, whose name and whereabouts were unknown, had abandoned the child.
A notice was published to inform the "unknown father."[1]
*86 Our supreme court in Matter of Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, Roe v. Doe, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), decided a case involving a challenge to the constitutionality of the consent provision in the adoption statute and reached a result consistent with the per curiam affirmance in this case. Because the facts in this case are significantly different and the policy issue raised by this appeal was not considered in Doe, I respectfully suggest that the result in Doe should not be binding in this case. I respectfully request my fellow panel members to join in certifying the following issue to the supreme court.

WHETHER SECTION 39.464(1), FLORIDA STATUTES, BY PERMITTING WITHDRAWAL OF THE SURRENDER AND CONSENT AFFIDAVIT ONLY WHEN FRAUD OR DURESS IS PROVED, UNDER THE FACTS OF THIS CASE, VIOLATED THE MOTHER'S DUE PROCESS RIGHTS.
Although in Doe, the supreme court did uphold section 39.464(1) against an equal protection challenge, it has not considered the constitutional challenge raised by this appeal.
There is no question that the mother has a fundamental liberty interest in the care, custody and management of her child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Obviously this right is subject to a knowing and intelligent surrender. But can the State, consistent with due process, bar parents from changing their minds even after a waiver and consent is properly executed when there has been no substantial change of position by anyone and the rights of others have not been substantially affected?
I submit that this issue requires the Lassiter analysis referred to in Santosky. In this due process analysis, three distinct factors must be considered: the private interest affected by the official action, the risk of erroneous deprivation of the interest through the procedures used, and the government's interest in avoiding the administrative burden that a different procedure might create. Lassiter v. Department of Social Services of Durham County, North Carolina, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, reh. denied, 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1023 (1981).[2] In considering these factors in the instant case, it becomes clear that a mother's right to the companionship of her child and the likelihood that this right will be erroneously deprived under the current system far outweigh the State's interest in maintaining its streamlined but inflexible procedure in adoption and/or termination cases.
First, the private interest (right to remain a parent) affected by the procedure of making the signing of the waiver and consent irreversible (except if based upon fraud or duress) is recognized as an extremely important right. Lassiter declared it "plain beyond the need for multiple citation" that a natural parent's "desire for and right to the companionship, care, custody and management of his or her children" is an interest "far more precious than property rights." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159, (quoting Stanley v. Illinois, 405 U.S. 645, *87 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).
Second, there is great risk of error created by the State's chosen procedure of mandating that the waiver and consent be irrevocable. It is possible that this policy of finality, as under the facts of the case, will directly conflict with the statutory guidelines set forth for determining the "manifest best interest of the child." Section 39.467(2), Florida Statutes (1991). After all, the child had lived with its mother and visited with its grandparents for all of its eight-month life except for the five days at the Adoption Centre. To mandate that the mere signing of the waiver and consent during a period of extreme depression (although not the result of fraud or duress) somehow satisfies the "manifest best interest of the child" is an error waiting to happen  and did happen in this case.
I submit that the mere signing of the waiver and consent does not negate the ability of the mother to provide the child with food, clothing and medical care [section 39.467(2)(a)]; the mother's capacity to care for the child [section 39.467(2)(a)]; the love, affection and other emotional ties existing between the mother and child [section 39.467(2)(a)]; the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity [section 39.467(2)(g)]; and the depth of the relationship existing between the child and the present custodian [section 39.467(2)(h)].
A policy that mandates dissolution of an otherwise loving and supportive family unit merely because of a temporary lapse in judgment carries a high risk of error.
Third, the countervailing governmental interest supporting use of the challenged procedure of finality is insufficient to sustain the policy. Obviously there will come a time, naturally flowing from the execution of the waiver and consent, when third party rights will vest and the best interest of the child under section 39.467(2) will be served by giving finality to the waiver and consent. At that point, withdrawal of the waiver and consent should be denied.
By making the execution of the waiver and consent final, the State has created a "bright line" rule which eliminates the need for a case-by-case determination of whether the parent should be able to withdraw consent. Admittedly, this rule ensures the quick and efficient resolution and disposal of termination cases. However, as the court in Stanley v. Illinois stated:
But the Constitution recognizes higher values than speed and efficiency. Indeed one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.
Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It, therefore, cannot stand.
Stanley v. Illinois, 405 U.S. at 656-57, 92 S.Ct. at 1215.
To hold that the mother herein is foreclosed from making her case that she is a fit and deserving mother who is able and most willing to continue providing a stable and supportive home for her child merely because the State has determined that the waiver and consent are final even though no intervening rights have emerged, is both unfair and unreasonable.
This is particularly evident when we compare the plight of this mother with the rights afforded a "volunteer mother" in a prearranged adoption agreement. Certainly if a bright line rule is appropriate for the mother in our case, I submit the rule should provide a rescission period of not less than the seven days given the mother who becomes pregnant pursuant to a preplanned adoption agreement specifically for the purpose of giving up her child for adoption. See Section *88 63.212(i)(1)(b), Florida Statutes (1991). In that case, even though the mother executes a written consent to terminate her parental rights at the time she enters the preplanned adoption agreement, and even though the intended parents have paid all of the volunteer mother's medical bills and living expenses, the volunteer mother nevertheless has her entire gestation period plus seven days to withdraw her consent for any reason. She is not required to show that either fraud or duress affected her original decision.
Although the supreme court in Doe determined that since the consent given in an agency adoption pursuant to Chapter 63 and the consent given in an intermediary adoption are both irrevocable, there is no equal protection problem, the court did not, but now should, consider this same challenge taking into account the non-final consent in a preplanned adoption agreement.
I would reverse.

ON MOTION FOR REHEARING EN BANC
This case involves an appeal from the trial court's order terminating the parental rights of appellant. This case was initially affirmed per curiam without opinion. Upon motion of appellant, a majority of the court agreed to consider the case en banc, and we now issue the following opinion affirming the order terminating appellant's parental rights.
Appellant voluntarily surrendered her nine-month-old son to the Adoption Centre for adoption. The Adoption Centre filed a petition to terminate appellant's parental rights pursuant to section 39.464(1) of the Florida Statutes, which sets forth the statutory framework for voluntary relinquishment of one's parental rights:
39.464 Grounds for termination of parental rights. The department, the guardian ad litem, or a licensed child-placing agency may petition for the termination of parental rights under any of the following circumstances:
(1) VOLUNTARY RELINQUISHMENT.  The parent or parents have voluntarily executed a written surrender of the child and also consent to the entry of a court order giving custody of the child to the department or to a licensed child-placing agency for subsequent adoption. The surrender document shall be executed before two witnesses and a notary public or other person authorized to take acknowledgments. A performance agreement or permanent placement plan need not be offered to the parent or parents, and the petition may be filed at any time before a performance agreement or permanent placement plan has been accepted by the court. The surrender and consent may be withdrawn only when the court finds that the surrender and consent were obtained by fraud or duress.
§ 39.464(1), Fla. Stat. (1991).
In opposing the Adoption Centre's petition, appellant argued that termination of her parental rights was not authorized because section 39.464(1) is unconstitutional in that it does not provide a "cooling-off period" for parents who have voluntarily executed a written surrender of their child and, further, because she surrendered the child under duress.
After two days of hearings at which the trial court received all of the evidence appellant sought to introduce, the trial court entered a detailed order[1a] terminating appellant's *89 parental rights. Appellant has appealed this order, again arguing that the statute is unconstitutional by reason of its failure to provide a "cooling-off" period, and that she surrendered the child while under duress.[2a]
We first note that our supreme court has upheld the constitutionality of the statute on due process as well as equal protection grounds in In re Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989). See also Gilliam v. Stewart, 291 So.2d 593 (Fla. 1974); Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). As for appellant's argument that the statute is unconstitutional because it fails to provide for a "cooling-off" period, we conclude that the remedy of providing a "cooling-off" *90 period in which a natural parent can withdraw an adoption consent is a remedy only the legislature can provide. Accord Hindman v. Bischoff, 534 So.2d 743, 744-45 (Fla. 2d DCA 1988), rev. dismissed, 542 So.2d 989 (Fla. 1989). It is not the function of appellate courts to correct what they perceive to be inequitable results produced by clear and unambiguous legislative mandates. In light of the supreme court's decision in Doe and the legislative policy regarding adoptions as set forth in section 63.022, Florida Statutes (1991), and especially subsection 63.022(2)(l) which was added in 1987, we leave the establishment of any "cooling-off" period to the legislature where that task belongs.
Second, although appellant claims that she surrendered her son while under duress, after listening to the testimony of appellant and her boyfriend, and considering the testimony of the Adoption Centre personnel, the trial court made an express finding, by clear and convincing evidence, that appellant's surrender of her child had been freely and voluntarily executed and that termination of appellant's parental rights was in the child's best interest.[3] The evidence of record certainly supports these conclusions.[4]
Because appellant has failed to demonstrate any reversible error, the order of the trial court terminating appellant's parental rights must be affirmed.
AFFIRMED.
GOSHORN, PETERSON, DIAMANTIS and THOMPSON, JJ., concur.
GRIFFIN, J., concurs and concurs specially with opinion in which GOSHORN, PETERSON and DIAMANTIS, JJ., concur.
HARRIS, C.J., dissents, with opinion.
DAUKSCH, J., dissents, with opinion.
W. SHARP, J., dissents with opinion in which HARRIS, C.J., and DAUKSCH and COBB, JJ., concur.
GRIFFIN, Judge, concurring specially.
I fully concur with the majority opinion and I write only against the contingency that further review of our decision in this case may be sought in light of the divided en banc vote. Although, like Judge Harris, I feel compassion for Trinity Henriquez, the statute applicable to this case is clear and has specifically been held constitutional by our supreme court. We were right originally to affirm without opinion. Some things are better left unsaid and I would prefer not to say them but, in the circumstances, someone needs to speak up for the trial judge.
First we have the brand new issues that have emerged on en banc rehearing of whether the lower court's findings of fact are legally sufficient and whether the record can support the lower court's ultimate finding that termination of appellant's parental rights is in the "best interests" of the child. These issues were never raised by the parties below or on appeal, never mentioned in the briefs or at oral argument. In fact, these "issues" were never alluded to in Judge Harris' lengthy dissent from the original per curiam affirmance.
There is no way of knowing whether the parties below understood that a "best interests" *91 determination had to be made by the lower court even where there had been a voluntary surrender of the child. They should have understood it  the statute is quite explicit that four grounds to terminate exist and if any is found, then the court should decide what is in the child's best interests. It is clear, at least, that the lower court understood the requirements of the statute, because it made the necessary, discrete "best interests" finding.
Ms. Henriquez did allege below that she was the most appropriate person to have care, custody and control of the child and that "revesting" her parental rights would be in the child's best interests  but then she never offered any evidence. Rather, the approach both her trial counsel and her new appellate counsel chose to take was to contend that the trial court was never authorized to consider termination at all because her decision to withdraw her written waiver of her parental rights effectively nullified the only statutory ground that would authorize a termination of parental rights proceeding to take place.[1]
The lower court thoroughly considered the two principal issues raised at trial by Ms. Henriquez: (1) that her emotional distress brought on by her boyfriend leaving her after discovering that the child was not his, was tantamount to "duress"; and (2) even if her situation did not rise to the level of fraud or duress, a mother should have at least the same amount of time to cancel a waiver of parental rights as a purchaser of a condominium unit in Florida has the right to cancel a purchase contract. After two days of hearings, at which the court received all of the evidence both parties sought to introduce, the lower court entered the detailed order set forth in the majority opinion, which included the following:
The Court finds, by clear and convincing evidence, that ...
C. The mother has freely and voluntarily executed a written surrender of her rights to the child and waiver of notice of these proceedings; said document is hereby accepted by the Court.
D. That all of the elements of Florida Statutes Chapter 39.467(2) have been met and the allegations of the petition have been proven by clear and convincing evidence.
E. That termination of parental rights for subsequent adoption is manifestly in this child's best interests... .
In addition to the lower court's opportunity to observe Trinity Henriquez at length in the course of her testimony, the lower court had substantial additional written evidence and testimony to consider. The mother, Trinity Henriquez, was twenty-five years old and she had a minimal employment history. Even though she was living with Eric Emerson for the past four years, the father of the child is an unknown individual named "Bob", whom she met in a bar and with whom she had a one night relationship. In describing her reasons for making an adoption decision, she wrote:
I believe every child should have a mother and a father. I cannot give you a father or a stable life. I want you to have the best life you could have. I loved you as much as I could, but I need to put my own life together.
The record shows that Ms. Henriquez has another child, a boy aged 6. She was not married to that child's father either, and when the boy was approximately 3 years old, she relinquished permanent legal custody to her parents. The Adoption Centre employee who counseled her testified that Ms. Henriquez had made a point of saying that one of the reasons she wanted to put this child up for adoption was that she did not want her mother raising him. In her waiver questionnaire she noted that she does not get along with her mother. She also said that she had been thinking about adoption since she became pregnant, had wanted to pursue adoption when her son was born, had not and was sorry she had not done so.
As for Ms. Henriquez's boyfriend, he testified that when he learned that the child was not his, approximately 9 months after the *92 child was born,[2] he simply dropped her and the child off at a friend's house and left, even though the child was ill and Ms. Henriquez was "out of control." He heard a "rumor" the same evening about her having put the child up for adoption but he did nothing.
Also important to the question whether the record contained sufficient evidence to support the trial court's decision that termination was in the child's best interests is the relinquishment itself. Although it is clear from the statute that the establishment of a "ground" for termination still requires the lower court to make a "best interests" analysis, the facts and circumstances giving rise to the ground for termination certainly can be considered in evaluating the child's best interests. Just as the facts surrounding acts of abuse, neglect or abandonment are relevant in determining the child's best interests, the facts and circumstances surrounding a voluntary waiver of parental rights are also relevant.
Judge Harris evidently sees appellant as a person at the mercy of her emotions. The lower court, however, after listening to the testimony of appellant and her boyfriend, and considering the testimony of the Adoption Centre personnel, made an express finding, by clear and convincing evidence, that her surrender of her child had been freely and voluntarily executed. When asked when she realized her surrender decision had been a mistake, Ms. Henriquez answered: "Whenever I had told mom  the lady I lived with, what I did and when I was taking down the baby's crib and everything." This was about two hours after she had returned home. Nevertheless, she did nothing for two days. Then she called the Adoption Centre to ask if the baby was okay and to arrange for pick up of the crib and high chair. She did not request the return of her child. That did not happen until five days later, after her parents returned to town. When asked at trial whether she realized when she signed the consent that she was agreeing to a permanent commitment of her baby for adoption, she answered: "I understood that I had given custody to some  to a foster home or wherever he went."
Florida law correctly provides that when a child is voluntarily surrendered by a parent, even where the parent changes his or her mind, the court should be apprised of the facts and is empowered to considered what is in the child's best interests. Certainly the court is entitled to consider all the foregoing as well as the question of what might happen to baby Eric the next time his mother's boyfriend leaves her and her parents go out of town. Indeed, the court was entitled to consider the likelihood that this child, like her other child, would be left by the mother to be raised by her parents, who are 58 and 53 years of age respectively, and whom the court has never seen because they did not appear to testify.
Judge Harris argues that the mother's willingness to continue as parent and the previous standard of care she has shown the child should be taken into account in any determination as to the child's best interests. With that statement, I wholeheartedly agree. Favorable evidence of the nature and extent of the mother's continuing commitment to the child and the quality of care she gave the child were matters of evidence for Trinity Henriquez to introduce, but she chose to offer nothing. The only evidence of the quality of her care of her child was offered by the Adoption Centre. Although not extensive, it does reflect that the child was ill,[3] "dirty" and "smelly" when they received him from her. Ms. Henriquez also had reported by telephone to the Adoption Centre that he had bruises from falling at her mother's house. The Adoption Centre offered all the evidence it had, which supports the judge's decision that termination was in the child's best interests. It was appellant who offered nothing  other than an excuse, which the lower court didn't accept.
Judge Harris has not entirely abandoned his contention that section 39.464 is unconstitutional; rather, it has now become the alternative basis for reversal. In his original *93 dissent, Judge Harris argued that the governmental interest that supports the use of a "fraud or duress" limitation on withdrawal of consent to foster finality of termination proceedings is insufficient until there "come[s] a time naturally flowing from the execution of the waiver and consent, when third party rights will vest." He may understand when this "time naturally flowing" has so vested third party rights that the State of Florida is finally permitted to consider the mother's surrender to be final, but it would likely be a mystery to the less metaphysically gifted among us. There is a new refinement of this argument on rehearing, however. The "time naturally flowing" appears now to have become a two-prong test: (1) a petition to terminate parental rights must have been filed prior to withdrawal of consent and (2) some undefined "rights" of "potential adoptive parents" must have come into existence. What these "rights" are and what is required for these persons' rights to "come into existence" is still not explained.
This statute, which is attacked on constitutional grounds, simply says that if a parent undertakes to sign a document surrendering all rights to his or her child and consents to the adoption of that child, and does so without any fraud or duress influencing his decision, then the courts of Florida are empowered to entertain a proceeding to determine whether it is in the child's best interests that the signor's parental rights be terminated. Only if the consent was procured by fraud or duress can the parent nullify the ground for termination and avoid a hearing on the child's best interests. It does not seem either logical or desirable that a parent who has voluntarily and formally given away his or her child can, at his or her whim, take the child back and require the courts to pretend it never happened merely because no identifiable substitute adoptive parents with "rights" of their own yet exist. This is a property concept inappropriate to apply to children.
This statute does not fail the three-prong test of Santosky. First, and of critical importance is the fact that the state has done nothing to burden appellant's precious parental right. As the lower court found, she gave it up. It was she who contacted the agency; she went to them, she went through all their procedures and counseling. She freely and voluntarily executed the surrender, handed over her baby to strangers and left. When she executed the document, her rights were gone and the state had nothing to do with it. In fact, the fraud/duress provision in section 39.464 probably does no more than codify the already existing legal or equitable grounds that would be available to her to rescind or avoid the written surrender. The state has not violated this parent's due process rights by failing to create a device by which she can be relieved of her voluntary act. Besides, any perceived constitutional problem is avoided because the trial court could have ruled that it was in baby Eric's best interests to stay with his mother, notwithstanding her written surrender.
Judge Harris also focuses unduly on the parent's right to the "companionship, care, custody and management" of one's children, which is "far more precious than property rights." Although it is true that a parent's rights are important, so are the child's rights. As our supreme court said in Padgett v. Department of Health and Rehabilitative Services, 577 So.2d 565, 570 (Fla. 1991), a child also has a fundamental liberty interest in being free from physical and emotional violence, and being given away to strangers is a pretty emotionally violent act. It might not be such a bad thing if the courts of this state let parents know that children are not just property to which parents have rights, but persons to whom they owe a sacred trust.
The legislature surely has the power to balance the "rights" of such parents with those of the children whose lives are at their mercy. Surely it has the power to determine that a parent who gives his or her child away may not simply change his or her mind and demand the child back, until there is a hearing and the court decides it is in the child's best interests to do so. The state's interest is compelling: it must protect children that evidence suggests are unwanted or at risk  a risk that we now understand threatens not only the child, but all of society.
The legislature also has a compelling interest in assuring the effectiveness and finality of a surrender so that new potential adoptive *94 parents will be willing to risk an emotional connection with the child. What adoptive parent in their right mind would take such a risk where the efficacy of the natural parent's surrender depends on a post hoc determination of the moment when the "naturally flowing" consequences of the surrender have finally caused their rights to vest so fully that the parent can no longer change his or her mind.
As the majority has pointed out, the power of the state to require fraud or duress as a ground to cancel a surrender and consent to adoption has already survived attack on due process and equal protection grounds. In Matter of Adoption of Doe, 543 So.2d 741 (Fla. 1989), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), the supreme court considered and rejected a challenge to the adoption statute based on the notion that making fraud and duress the only grounds to permit a parent to withdraw consent violated due process or equal protection. At the time it did so, the supreme court had the benefit of this court's earlier opinion in In Interest of I.B.J., 497 So.2d 1265 (Fla. 5th DCA 1986), review denied, 504 So.2d 766 (Fla. 1987), in which the court expressed views very similar to those that underlie the dissent of Judge Harris. In I.B.J. the court held that, until a child has been permanently committed to the custody of the agency in a Chapter 39 proceeding, a natural parent has an unfettered right to withdraw any surrender or consent to an agency adoption. 497 So.2d at 1266. The I.B.J. court further held that any "fraud and duress" limitation on withdrawal of consent to adopt could not apply to agency adoptions because the predicate, permanent commitment, was controlled by Chapter 39 and there was no fraud/duress limitation in Chapter 39. Id. at 1267. The legislature nullified I.B.J. by amending section 39.464(1)[4] to add the fraud and duress language. In like fashion, the supreme court expressly disapproved I.B.J. in Doe. It is extremely doubtful that all along, completely unnoticed, the due process clause of the federal Constitution has guaranteed this unfettered right to withdraw the voluntary surrender of a child at any time until third party rights have "come into existence."
GOSHORN, PETERSON and DIAMANTIS, JJ., concur.
HARRIS, Chief Judge, dissenting.
Trinity Henriquez (Trinity) gave birth to a son on January 2, 1992. She and her son lived with her boyfriend up until about September 2, 1992, when a blood test (apparently required by HRS) determined that her boyfriend was not the father of the child. Her boyfriend then became upset and returned Trinity and her child to her parents' home. Her parents were out of town.
Feeling alone and scared, abandoned and unable to support her child, she called the Adoption Centre. The Adoption Centre immediately sent a taxi to pick up Trinity and her child. In a short period of time (at one sitting) she signed the waiver of her parental rights and her consent for adoption. She was sent home, alone, by taxi.
Five days later, after her parents returned and assured her of their continued support (the grandparents, after all, had also created a bonding relationship with the child during the eight months it had lived with their daughter) and after her boyfriend acknowledged his commitment to the child, and before any action had been commenced to terminate parental rights based on the consent and before any adoptive parents came into view, she notified the Adoption Centre that she wished to withdraw her waiver and consent and have her child returned. The Adoption Centre refused her request and instead filed a petition for dependency and termination of parental rights.
There is disagreement on this court, and confusion in the statutes, as to what rights a mother has who voluntarily consents but attempts to withdraw that consent before any action is taken on that consent and any potential adoptive parents have been found. It is urged that she, even though she may not be permitted to withdraw her consent because she cannot show fraud or duress, nevertheless is entitled to the return of her child unless the court, pursuant to section 39.467, *95 properly determines that it is in the "manifest best interest" of the child that termination take place.[1] This position is based on the language of section 39.467(1):
In a hearing on a petition for termination of parental rights, the court shall consider the grounds for termination and the manifest best interest of the child.
Indeed, it was stated in Kingsley v. Kingsley, 623 So.2d 780, 790 (Fla. 5th DCA 1993) (Harris, C.J., concurring in part, dissenting in part):
Termination of parental rights requires a two step analysis. First, did the parents do something that the State has determined to be sufficiently egregious to permit forfeiture of their right to continue as parents (abuse, neglect, abandonment, voluntary consent to adoption)? Unless the answer to this first question is affirmative, the second step in the analysis (the best interest of the child) is unnecessary. [emphasis added].
Assuming that the court in this case was required to conduct a manifest best interest analysis after it determined that the mother's consent could not be withdrawn because of her inability to prove fraud or duress, the court failed to do so and for that reason its judgment should be reversed.
In order for the court to properly conduct a section 39.467 manifest best interest analysis, it must evaluate the following relevant factors:
(a) The ability and disposition of the parent or parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under state law in lieu of medical care, or other material needs.
(b) The capacity of the parent or parents to care for the child to the extent that the child's health and well-being will not be endangered upon the child's return home.
(c) The present mental and physical health needs of the child and the future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child.
(d) The love, affection, and other emotional ties existing between the child and the child's present parent or parents, siblings, and other relatives and the degree of harm to the child arising from the termination of parental rights and duties.
(e) The likelihood of an older child remaining in long-term foster care upon termination of parental rights due to emotional or behavioral problems or any special needs of the child.
(f) The child's ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship *96 as a result of permanent termination of parental rights and duties.
(g) The length of time that the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.
(h) The depth of the relationship existing between the child and the present custodian.
(i) The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
(j) The recommendations for the child provided by the child's guardian ad litem or legal representative.
(k) Any suitable permanent custody arrangement with a relative of the child.
It is submitted that no one reading this record will find that the trial court evaluated any of these factors. Certainly, its order reflects no such evaluation.
It is apparent instead, that the trial court and the Adoption Centre, Inc., who is in the business of processing consent adoptions, believed that termination is, as a matter of law (as night follows day), in the manifest best interest of the child if the consent cannot be withdrawn because of no showing of fraud or coercion.[2]
Consider the pleadings:
4. That now it appears to be manifestly in the best interest of the child that an order of adjudication of dependency and an order of termination of parental rights be entered because:

The mother freely and voluntarily executed a written affidavit and acknowledgment of surrender, consent and waiver of notice in accordance with law.
No facts to establish the section 39.467(2) "relevant factors" were pled and no evidence, other than evidence to establish the voluntariness of the consent, was introduced in order to justify the "best interest" finding by the court. If it is necessary to prove that termination is in the manifest best interest of the child in consent terminations, the burden of such proof should be on the party urging termination.
Also consider the arguments made by the Adoption Centre:
On behalf of the Adoption Centre, I am requesting that the Court find Ms. Henriquez' consent and surrender for voluntary relinquishment and adoption irrevocable, and enter an order terminating her parental rights. [Opening statement.]
* * * * * *
Your Honor, again, I'm going to state in closing that a consent and surrender for termination of parental rights for subsequent adoption is irrevocable, absent a finding of fraud or duress.
The evidence has shown that Ms. Henriquez gave her consent and surrender voluntarily. The doctor says she exercised poor judgment. Many birth parents exercise poor judgment. I believe at the time, she was thinking of her son's best interest. She was counseled and she took an oath.
Your Honor, Ms. Henriquez has been unable to meet her burden and I ask this Court to find her surrender and consent for termination of parental rights irrevocable and to terminate her rights. [closing statement.]
Even in its brief before this court, the Adoption Centre attempts to justify the trial court's decision because of the irrevocability of the consent  not because of a properly conducted section 39.467 best interest finding.
Absolutely no evidence was submitted to or considered by the court for its determination that termination was in the manifest *97 best interest of the child pursuant to the provisions of section 39.467(2). And the court made no such finding in its order.
The only "findings of fact" that can be gleaned from the court's order (and these weren't pled) are the following:[3]
1. The child was born January 2, 1992 in Orlando to Trinity Ann Henriquez.
2. The mother had an ongoing out-of-wedlock relationship with her boyfriend Eric for years.
3. The father of the child, however, is a man named Bob whose last name and whereabouts are unknown.
4. The mother, when she was a teenager, gave up a previous child to her mother.
5. The mother has had abortions.
6. She had considered an abortion when she was pregnant with this child.
7. Because her boyfriend became upset when he learned he was not the father of the child, he drove the mother and the child "back home."
8. The mother thought Eric wanted nothing else to do with her.
9. Because she thought Eric would not help her financially, the mother believed it would be in the child's best interest to give him up for adoption.
10. She changed her mind five days after signing the consent.
The mother's pregnancy record (which makes up most of the above findings) was not introduced to show that the mother was "unfit" but rather to show that she "is a woman who knows all about available options to raising a child" and thus was relevant to show that she understood the significance of executing the consent and waiver.
Even (especially) the Adoption Centre is not arguing that a mother who gives up one child is foreverafter unfit to mother subsequent children. And it is doubtful that the trial court is indicating by its order that one who has a child out-of-wedlock (or even one who has had abortions) forfeits the right to be a parent. It is submitted that these facts were set out, not to justify the court's best interest finding, but rather to justify its finding that the mother could not withdraw her consent because no fraud or duress was shown.
Even assuming, however, that these stated facts (the only facts relied on by the majority opinion) were what the trial court relied on in making its manifest best interest ruling, they simply, as a matter of law [considering the requirements of section 39.467(2)] do not establish "by clear and convincing evidence" that it is in the manifest best interest of the child that the mother's parental rights be terminated.[4]
The court's judgment therefore should be reversed for this reason if the law requires that a mother is entitled to a proper section 39.467 manifest best interest analysis before termination is justified in a consent termination proceeding.
I agree with the excellent dissent by Judge Sharp on this point and urge the certification of the following question:
DOES SECTION 39.467 REQUIRE THAT THE COURT, EVEN AFTER A VALID WAIVER AND CONSENT, CONDUCT A MANIFEST BEST INTEREST ANALYSIS BASED ON THE FACTORS SET OUT IN THE STATUTE?
Now consider a more difficult proposition. Assume that the trial judge and the Adoption Center are correct in their conclusion that the law requires nothing more in a consent termination than proof that the consent was not the result of fraud or duress. That is, that it is conclusively presumed that termination is in the manifest best interest of the child if a voluntary consent is proved.
*98 But if the parent (mother in this case) does withdraw her consent prior to the filing of the termination action, what public purpose is served by cutting off her right to contest for the return of her child? Even if the withdrawn consent remains a ground for termination,[5] the fact that the mother is willing to continue as a parent and the previous standard of care she had shown the child should be taken into account in any determination as to the child's best interest. In this case, the court merely found that the consent was not the result of fraud or duress and, therefore, could not be withdrawn and as a result failed to consider the mother's desire to continue as mother and also failed to consider her previous relationship with and care for the child in determining the child's best interest.
In Matter of Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, Roe v. Doe, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), our supreme court determined that the consent provision in the adoption statute in an equal protection challenge was constitutional. However, because the facts in this case are significantly different and the policy and legal issues raised by this appeal were not considered in Doe, the result in Doe is not dispositive of this case. But because of Doe, I would ask the following question of the supreme court:
DOES SECTION 39.464(1), FLORIDA STATUTES, AS APPLIED BY THE COURT IN THIS CASE TO PREVENT RECOGNITION THAT THE MOTHER WITHDREW HER CONSENT EVEN BEFORE THE PENDING ACTION WAS FILED (BECAUSE NO FRAUD OR DURESS WAS SHOWN) AND FURTHER TO JUSTIFY TERMINATION OF PARENTAL RIGHTS AS BEING IN THE MANIFEST BEST INTEREST OF THE CHILD ON NO OTHER BASIS THAN THE ORIGINAL SIGNING OF THE VOLUNTARY CONSENT, VIOLATE BOTH THE MOTHER'S AND THE CHILD'S DUE PROCESS RIGHTS?
Although in Doe, the supreme court did uphold section 39.464(1) against an equal protection challenge,[6] it did not consider the following constitutional challenge based on due process.[7]
*99 There is no question that the mother has a fundamental liberty interest in the care, custody and management of her child.[8]Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Obviously this right is subject to a knowing and intelligent surrender. But can the State, consistent with due process, terminate parental rights by barring parents from changing their minds (even after a waiver and consent is properly executed) when the change of mind occurs before the petition for termination is even filed and before the rights of any potential adoptive parents come into existence?[9]
The answer to this question requires an application of the Lassiter analysis referred to in Santosky. In this due process analysis, three distinct factors must be considered: the private interest affected by the official action, the risk of erroneous deprivation of the interest through the procedures used, and the government's interest in avoiding the administrative burden that a different procedure might create. Lassiter v. Dept. of Social Servs. of Durham County, North Carolina, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, reh. denied, 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1023 (1981). In considering these factors in the instant case, it becomes clear that a mother's right to the companionship of her child and the child's right to the companionship of its mother likely will be erroneously deprived under the current system and that this far outweighs the State's interest in maintaining its streamlined but inflexible procedure in adoption and/or termination cases by making the consent final regardless of how early the mother attempts to change her mind.
First, the private interest (right to retain the parent/child relationship) affected by the procedure of making the signing of the waiver and consent irreversible (except if based upon fraud or duress) is recognized as an extremely important right. Lassiter declared it "plain beyond the need for multiple citation" that a natural parent's "desire for and right to the companionship, care, custody and management of his or her children" is an interest "far more precious than property rights." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2165, [quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)].
At this stage of the proceedings, the child's interest is the same as the mother's. At this fact-finding stage of the proceedings to determine if the mother did something grievous enough to justify termination of her parental rights, the parent-child interest is the same.
At the fact-finding the State cannot presume that a child and his parents are adversaries ... But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the fact-finding, the interest of the child and his natural parents coincide to favor use of error reducing procedures.
Santosky, 455 U.S. at 760, 102 S.Ct. at 1398.
A policy that assumes that merely because a mother, during a highly emotional period of her life, signs a consent (and almost immediately withdraws it) makes a foster or adoptive home a better alternative than returning *100 the child to its mother is indeed a dangerous and unwise policy.[10]
And such assumption seems inconsistent with the legislative policy "that each child be assured the care, guidance and control in a permanent home which will serve the best interests of the child's moral, emotional, mental and physical welfare and that such home preferably be the child's own home or, if that is not possible, an adoptive home."[11] Performance agreements, when appropriate, are required in order "to assure the safe return of the child to his parents."[12] The policy of this state, therefore, recognizes that both the parents and the child have an important liberty right in maintaining the family relationship.
It is indeed ironic that a legislative scheme which sets as public policy the requirement that the State work (through performance agreements) even with parents who abuse or neglect their children in order that their children may be safely returned to them, can also mandate that a mother who signs a consent for adoption because she feels that it will protect her child from neglect  and then changes her mind even before the petition for termination is filed  is somehow beyond redemption.
Second, the State's chosen procedure of mandating that the waiver and consent be irrevocable creates great risk of error. It is possible that this policy of finality, as under the facts of this case, will directly conflict with the statutory guidelines set forth for determining the "manifest best interest of the child." § 39.467(2), Fla. Stat. (1991). After all, the child had lived with its mother and visited with its grandparents for all of its eight-month life except for the five days at the Adoption Centre. To mandate that the mere signing of the waiver and consent during a period of extreme depression (although not the result of fraud or duress) somehow satisfies the "manifest best interest of the child" is an error waiting to happen  an error that did happen in this case.[13]
The mere signing of the waiver and consent does not negate the ability of the mother to provide the child with food, clothing and medical care [section 39.467(2)(a)]; the mother's capacity to care for the child [section 39.467(2)(a)]; the love, affection and other emotional ties existing between the mother and child [section 39.467(2)(a)]; the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity [section 39.467(2)(g)]; and the depth of the relationship existing between the child and the present custodian [section 39.467(2)(h)]. A policy that mandates dissolution of an otherwise loving and supportive family unit merely because of a temporary lapse in judgment carries a high risk of error.
Finally, we consider the third prong of the Lassiter analysis: the countervailing governmental interest supporting the use of the challenged procedure of finality even if the consent is withdrawn before the petition to terminate parental rights is filed and any rights of potential adoptive parents have come into existence, we believe that the governmental interest is insufficient to sustain the policy.
By making the execution of the waiver and consent irrevocable except upon a showing of fraud or coercion, the State has ensured the *101 quick and efficient resolution and disposal of termination cases.
However, as the court in Stanley v. Illinois stated:
But the Constitution recognizes higher values than speed and efficiency. Indeed one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.
Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It, therefore, cannot stand.
Stanley v. Illinois, 405 U.S. at 656-57, 92 S.Ct. at 1215.
To hold that the mother herein is foreclosed from even making her case that she is a fit and deserving mother who is able and most willing to continue providing a stable and supportive home for her child, merely because the State has determined that a waiver and consent, once signed, is forever final regardless of how early the mother attempts to withdraw it, is both unfair and unreasonable. Section 39.464(1), Florida Statutes, as applied in this case, and under the Lassiter analysis, I urge, unconstitutionally denied the mother due process of law.
DAUKSCH, Judge, dissenting.
While I concur with both the dissent of Judge Harris and the dissent of Judge Sharp, which in essence are the same, I am also astounded that the majority opinion seems to rest almost solely on a statutory construction basis.
This is a case in equity, a case to determine if a child can be with its mother, a case to decide whether a mother has a right, an equitable right to be with her child.
Secondarily, even remotely, this is a case about whether the court should apply a statute governing adoptions to these vitally affected persons: the child, the mother, the grandparents, the sibling.
With not a bit of difficulty I say this case should be returned to the trial court for a full hearing to determine the best interests of this child and his mother. To do otherwise is nothing short of putting form over substance to the point of cruelty. Because there has been no adoption, there are no "bonded" adoptive parents, the child has been in foster care, the mother has been without her much-litigated-over child and this court looks to a statute for the best resolution of the litigation and then blames the legislature. Pure sophistry.
W. SHARP, Judge, dissenting.
I respectfully dissent. While I agree with much written in the majority opinion, and I cannot agree with all Judge Harris has written in his, I concur in his result. I think the issues involved in this case are sufficiently important to merit a written opinion with a full discussion of dissenters or concurrors. That is the way the substantive law in this area develops and can be clarified. My view of this case is perhaps simplistic: The Adoption Centre failed to prove its case for termination of parental rights and thus the order appealed should be reversed.
Pursuant to section 39.467, in order to obtain an order for termination of parental rights, the petitioner must prove the grounds required by the statute "by clear and convincing evidence." § 39.467(1). In this case, the two required bases were manifest best interest of the child, and voluntary relinquishment.[1] The Petition for Dependency and Termination filed by the Adoption Centre alleged only one of those two statutory basis  the mother's written consent.[2]
*102 In her pleading filed in opposition to the Adoption Centre's petition, Henriquez alleged duress and lack of consent to the termination of parental rights and that returning the child to its natural mother would be "in the best interests of the minor child." At the hearing which resulted in the termination order being appealed, the Adoption Centre presented its case solely on the issue of whether or not Henriquez gave her consent under duress. Henriquez' attorney also solely rebutted that issue.
Similarly, the trial court focused primarily in its findings of fact and conclusions of law on the duress issue. It did recite in a conclusory fashion that termination of parental rights was in the child's best interests. However, the evidence presented at the hearing relates exclusively to the duress issue.
In my view, this record does not provide a legally sufficient basis upon which to terminate Henriquez' parental rights because one vital required ground (best interest of the child) was totally ignored. Section 39.467(2) provides a non-exclusive laundry list of factors which could be considered on this "best interest" issue.[3] None was put in evidence by the Adoption Centre. Thus, I submit, that both required grounds of section 39.467(1) for termination of parental rights were not established by "clear and convincing evidence." See In re Adoption of Baby Girl C., 511 So.2d 345 (Fla. 2d DCA 1987).
When a party brings a lawsuit and fails to allege and prove an essential element of a cause of action, that party should lose the case. See, e.g., Idzi v. Hobbs, 186 So.2d 20 (Fla. 1966); Della-Donna v. Nova University, 512 So.2d 1051, 1055 (Fla. 4th DCA 1987). Here, the Adoption Centre had the burden of proving both required elements to succeed. Failure to do so makes this judgment entered in its favor attackable on appeal even though appellate counsel did not expressly raise this ground. This is because I think the rights involved are "fundamental" ones. See Padgett v. Department of Health and Rehabilitative Services, 577 So.2d 565, 570-571 (Fla. 1991). Accord, Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599 (1982); Skinner v. Oklahoma, 316 U.S. 535, 539, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). I agree with Judge Harris that parental rights are among the most important and precious which our state and nation protect.
*103 Accordingly, I would reverse the order terminating Henriquez' parental rights and remand for further proceedings.
HARRIS, C.J., and DAUKSCH and COBB, JJ., concur.
NOTES
[1] The unknown father, or perhaps "unknowing father" would be a more accurate description, did not participate in this case. Since the published "notice" in this case was not "reasonably calculated, under all the circumstances, to apprise" the father of these proceedings, he was given no notice. It is not surprising, therefore, that the biological father did not appear to contest this matter below. It is also not surprising that neither he, nor the mother on his behalf, appealed the termination of his parental rights. The father is not aware of his rights; the mother has no interest in protecting them. It is true that section 39.462(1)(a)2 requires no notice to an unmarried father who fails to either adopt the child, have his paternity established in court, acknowledge paternity in a writing filed with HRS, or provide repetitive support. But if the father is unaware of the proceedings, what opportunity does he have to prove that he, in fact, adopted the child, had his paternity established in court, acknowledged paternity in writing and filed it with HRS or provided repetitive support?

The statute's denial of notice is circular reasoning at its best and jurisprudence at its worst. Can we permit the mother's testimony to bind the father (he has no opportunity to cross-examine); do we require the adoption agency to examine the court files, the HRS file and the mother's checking accounts to determine if the statute's restrictions on the right to notice was applicable in this particular case? The answer, I think, is no. And yet the court's order in this case, without the biological father being a party to the action, purports to terminate his liberty right to be a parent to his child.
Further, even though section 39.462(1)(a)2 does not require notice to a father who has not complied with the statutory conditions entitling him to notice, constitutional due process does:
However, the determination that notice was not statutorily required is not dispositive of this issue. Notice to legally interested parties so that they can assert their claims is the essence of the procedural due process protections provided by the Florida Constitution, Art. I, § 9, Fla. Const. As the United States Supreme Court has said:
An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).
In re Adoption of a Minor Child, 593 So.2d 185 (Fla. 1991).
I concede that the issue of the father's right to notice is not raised in this appeal and its determination is not essential to the mother's constitutional challenge relating to her rights. But the court's order terminating the father's parental rights is before us, and the record makes it clear that he was not properly served. To disregard the problem now will only make the consequence of having to consider it later potentially much more difficult.
Because the mother has lost her appeal, she may now remember the father's name or how to locate him. Indeed, the issue of the father's rights may well be before the court in the near future.
I choose to address the problem now (at least by footnote) because we may face that "tragic" case which was "an unbelievable traumatic event" that confronted the Iowa Supreme Court in In Interest of B.G.C., 496 N.W.2d 239 (Iowa 1992) (the Baby Jessica case). There, like here, the biological father was "unknown" at the time of the termination proceedings. But the mother in that case, after deciding to withdraw her consent to adopt, sought him out and he came forward. The court refused to rule that Daniel (the tardy biological father) had abandoned his child:
While it is true that Daniel has not shared in any of the expenses in connection with the birth, he was never requested to do so. Nor was there any need to pay the expenses until he learned the child was his. Abandonment is defined as the relinquishment or surrendering of parental rights and includes both the intention to abandon and the acts by which the intention is evidenced.
B.G.C., 496 N.W.2d at 245.
Potential adoptive parents should be cautioned that before they get emotionally involved in the life of a child up for adoption, they should assure themselves that the termination proceedings were conducted in accordance with constitutional due process. Currently, so far as we know, there are no specific potential adoptive parents involved in this case.
[2] The Supreme Court first articulated these factors in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court once again referred to them in Lassiter and adopted them in Santosky.
[1a] child was born January 2, 1992 in Orlando, Florida to Trinity Ann Henriquez. The father's name was Bob, last name and whereabouts unknown. The mother testified she and Eric Emerson had been boyfriend/girlfriend for years. At one point in time, the mother had sex relations with an individual named Bob and became pregnant by him. There is no showing whatever that Bob was ever involved with the child or ever offered any support of him.
The mother's pregnancy history was provided and admitted into evidence. It indicates two live births and five abortions. [The record shows that she had given custody of her first son to her mother. At the time of the surrender of baby Eric, this child was six years old.]
On or about September 2, 1992, the mother and boyfriend, Eric, received blood tests results indicating that Eric Emerson was not the father of the subject child. As of that date, the mother and Eric were living together out of wedlock. The mother testified that Eric got upset in regard to the child's paternity and mother and child were packed up and driven "back home." At that time, the mother testified that Eric wasn't sure whether he wanted anything else to do with her. She felt alone and scared. When she got home, she called The Adoption Centre and they sent a cab to pick her and the child up and delivered them to the offices of The Adoption Centre. The mother had thought of giving the child up for adoption when she was pregnant. She testified she thought the adoption would be the solution to her financial problem. She assumed on her own that Eric was going to provide no further financial support and that giving the child up for adoption would be in the best interest of the child. She stated she received no counseling at The Adoption Centre and that she did not understand what she was signing when she signed the "Affidavit and Acknowledgement of Surrender, Consent and Waiver of Notice" because she was emotionally disturbed. On September 2, she left the child and many of his belongings at The Adoption Centre. She testified that she understood that she "had given custody to a foster home or wherever he went." Two days later she called The Adoption Centre and made no mention of wanting her baby back. The following Monday, five days after the consent was signed and the child delivered to the Petitioner, she advised the Petitioner she wanted the baby back. The Petitioner refused and the various pleadings were filed in this action.
Susan Hammes, counselor at The Adoption Centre talked with the mother on September 2 when the mother and child came to their offices. She testified that the mother told her that she had another son who had been given to the maternal grandmother because the mother did not want to raise him. She told Ms. Hammes, that she could not adequately parent the child and the mother rejected the offer of temporary foster care. She further testified that they talked about the irrevocable nature of the papers and that the birth father was not providing support. In the next phone call from the mother, within two days, the mother asked if the petitioner wanted the crib or high chair and made no mention of wanting the child back. The witness testified that she looked at the emotional demeanor of women giving their children up for adoption and that the mother "was very deliberate" in her actions September 2. Mrs. Hammes spent up to 3 1/2 hours with the biological mother.
Other witnesses for The Adoption Centre testified. Lynn Wier notarized the surrender and other forms signed by the mother. She and Doctor Boisselle testified that Doctor Boisselle explained the final nature of the documents she was signing.
Eric Emerson testified that he and the mother lived together most of the time for the last four years. He testified they were both shocked to learn that he was not the father of the child. He testified that he took the mother and child to a friend's house and that she was sobbing hysterically and was exhausted.
Dr. Pamela Green, psychologist, testified she evaluated the mother on October 28, 1992 and also saw her November 5, 1992. She testified the mother would have been in severe distress, acting impulsively and suffering "acute situational reaction" on September 2, 1992. She further testified the mother's ability to make rational decisions was severely impaired at the time and that the mother was immature in her actions and behavior. She further testified the mother was not incompetent.
The court has applied the criteria set forth in Fl. Civil Jury Instruction 2.2 in evaluating the testimony and creditability [sic] of all witnesses. .. .
The case law when applied to the facts of this case, indicate to this court the petitioner herein, The Adoption Centre, Inc., should prevail.
Counsel for the Parties both presented their cases to the Court in a highly competent manner.
The Court finds, by clear and convincing evidence, that ...
C. The mother has freely and voluntarily executed a written surrender of her rights to the child and waiver of notice of these proceedings; said document is hereby accepted by the Court.
D. That all of the elements of Florida Statutes Chapter 39.467(2) have been met and the allegations of the petition have been proven by clear and convincing evidence.
E. That termination of parental rights for subsequent adoption is manifestly in this child's best interests... .
[2a] Appellant also claims that the termination order must be reversed because she was not provided with effective assistance of counsel. We reject this claim without discussion because our review of the record reveals that, as the trial court noted, counsel provided "highly competent" representation.
[3] In this regard, we note that appellant did not argue on appeal or in the trial court that the evidence submitted below and the findings of the trial court failed to establish, as a matter of law, that termination of the appellant's parental rights was in the best interest of the child, or that the findings of the trial court, as set forth in footnote 1, supra, fail to comply with section 39.467(2), Florida Statutes (1991), and we reject the contention that any failure of the trial court to make more detailed findings of fact constitutes fundamental error because any such alleged error does not go to the foundation of the case or to the merits of the cause of action. See Bayer v. State, 597 So.2d 870, 872 (Fla. 5th DCA 1992). See also Sanford v. Rubin, 237 So.2d 134, 137 (Fla. 1970) (our supreme court cautioned that appellate courts should exercise discretion under the doctrine of fundamental error very guardedly). Accord Ashford v. State, 274 So.2d 517, 518 (Fla. 1973).
[4] See Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993) (because the standard of proof below was clear and convincing, this court may not overturn the trial court's findings unless it may be said, as a matter of law, that no one could reasonably find such evidence to be clear and convincing).
[1] See § 39.464, Fla. Stat. (1993).
[2] Interestingly, Eric Emerson does not appear on the birth certificate as the child's father. No father is named.
[3] The illness was attributed to a DPT shot and an ear infection.
[4] Ch. 90-309, Laws of Florida, (1990).
[1] It has been questioned why this argument was not raised in the original dissent. The answer is obvious. The original majority was a PCA and, therefore, did not reveal the basis for the affirmance. Based on the record before this court  a complaint that had no reference to section 39.467 and alleged no facts relevant to any of the mandated factors listed in said section; a transcript of the testimony which revealed that no evidence was submitted to satisfy the requirements of section 39.467; argument of counsel that completely ignored section 39.467 and its requirements; and the order of the trial court that was completely silent as to section 39.467 and discussed none of the factors required by it  it appeared inconceivable that anyone could believe that the court conducted a manifest best interest hearing required by the statute.

Although Trinity was certainly given a hearing, the record is clear that it was merely a hearing to determine whether she had voluntarily signed the consent and, if so, whether she had any legal reason to withdraw that consent. It, therefore, appeared that the original majority, because of statutory inconsistency and perhaps precedent (at least by implication) from other district courts, found that one who has voluntarily consented to adoption is not, as a matter of law, entitled to a manifest best interest hearing. Perhaps the current majority also feels this way. I responded then, as I do now, why I believe that if the law does not provide her this type of hearing, she is being denied procedural due process of law. And I contend that it is the petitioner for termination that has the section 39.467 burden  not the parent.
It was surprising to discover that a majority of this court, for whatever reason, finds that Trinity actually was given the appropriate hearing. This enlarged response, therefore, is not an afterthought; it is a response to a new majority opinion that I believe is wrong.
The majority is so committed to its position that it refuses to join in the certification of this most troubling and important issue to the supreme court.
This is even more surprising.
[2] Indeed, this appears to be assumed by all the reported cases on consent terminations. In the lengthy statement of facts in Matter of Adoption of Doe, 524 So.2d 1037 (Fla. 5th DCA 1988), decision quashed, 543 So.2d 741 (Fla. 1989), cert. denied, Roe v. Doe, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), none relate to a section 39.467 manifest best interest analysis. Nor did the court discuss the manifest best interest of the child in In Interest of I.B.J., 497 So.2d 1265 (Fla. 5th DCA 1986); nor in In Interest of J.R.G., 624 So.2d 273 (Fla. 2d DCA 1993). The focus is always on whether the consent can be withdrawn; it appears that the courts aren't even curious as to whether it will be in the best interest of the child to enforce the consent.
[3] These are extracts and not quotes.
[4] Since section 39.467(7) requires that the trial court enter a written order stating its findings of fact, we must assume that these were the only facts relied on by the court. These facts are conspicuous because they make no reference whatsoever to the relevant factors mandated for evaluation by section 39.467(2). Since the legislature has mandated that the court set out its factual findings and the conclusions it draws from the facts, we cannot speculate that it might have made other findings or reached other conclusions.
[5] It would be more consistent with the purpose of the termination proceedings generally and the proper role of the State in such proceedings if the statute were construed to require that the consent still be voluntary at the time of the filing of the termination proceedings:

As parens patriae, the State's goal is to provide the child with a permanent home ... yet while there is still reason to believe that positive, nurturing parent-child relationships exist, the parens patriae interest favors preservation, not severance, of natural familial bonds. (Citation Omitted.) [T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents. Stanley v. Illinois, 405 U.S. at 652, 92 S.Ct. at 1213.
The State's interest in finding the child an alternative permanent home arises only "when it is clear that the natural parent cannot or will not provide a normal family home for the child." (Citation omitted.) At the fact-finding, that goal is served by procedures that promote an accurate determination of whether the natural parent can and will provide a normal home.
Santosky, 455 U.S. at 767, 102 S.Ct. at 1402.
It is submitted that if the mother, prior to the action being filed, makes it clear that she will provide a normal home, then the pleadings should concentrate on why she is unable to do so. In other words, justice would be better served if the petition were required to allege unfitness other than the fact that at an earlier date the mother signed a consent and then withdrew it before the petition was filed.
[6] There is no indication in Doe that the supreme court was aware that courts were not requiring a meaningful manifest best interest analysis under section 39.464.
[7] It should be noted that the Second District had a case involving similar facts in In re Adoption of Baby Girl C, 511 So.2d 345 (Fla. 2d DCA 1987). In that case, the court inquired:

Why should not a single parent in circumstances like those of this natural mother, who was surely, as the trial court found, subjected to great pressure out of concern for her child if the mother went to jail, be entitled to revoke her consent a short time later [In Baby Girl C the time was "about a week," two days longer than in this case.] before any would-be adoptive parents took custody of the child? Since the threat or existence of a criminal prosecution against a mother, by itself, is surely not a proper basis to conclude that a mother necessarily is unfit to be the parent of her child, ... why should this natural mother's circumstances be considered ... to be different in principle from those of any mother who, believing she will be required to go away for an extended period without her child for business or personal or health reasons, is distraught and irrationally signs an adoption consent form? Why should she not be able to effectively withdraw her consent a short time later where, as in this case, she did so before any would-be adoptive parents took custody of the child?
Baby Girl C at 353.
Indeed, why not? Is the only answer "Because the legislature said so" constitutionally acceptable? The court in Baby Girl C was able to avoid this issue and the injustice visited upon the mother in our case because there the trial court expanded the definition of "duress" to include "duress by force of circumstances" and refused to limit it to only externally applied pressure. The trial court in our case, undoubtedly because in Doe we held that financial hardship could not constitute duress, was not so benevolent.
[8] Indeed, the sanctity of the parent-child relationship is a liberty interest protected under both the state and federal constitutions. Doe at 749 (Barkett, J., specially concurring).
[9] In Doe, the contest was between a consenting parent (mother) and an abandoning parent (father) on the one hand and the adopting parents on the other. In our case, there are no adopting parents asserting rights.
[10] See, for example, Judge Blackmun's statement in Santosky relating to the trial court's theory that assumes termination of the natural parents' rights invariably will benefit the child:

This is a hazardous assumption at best. Even when a child's natural home is imperfect, permanent removal from the home will not necessarily improve his welfare.
Santosky, 455 U.S. p. 765, n. 15, 102 S.Ct. p. 1401, n. 15.
[11] § 39.45(2), Fla. Stat.
[12] § 39.451(1), Fla. Stat.
[13] The majority in Doe recognized that the best interest of the child was the overriding consideration:

This recognition of the overreaching importance of the child's well-being is consistent with federal case law which "has emphasized the paramount interest in the welfare of children and has noted the rights of the parents are a counterpart of the responsibilities they have assumed." (Citation omitted).
Doe, 543 So.2d at 744.
By failing to consider the manifest best interest of the child pursuant to the directions of section 39.467, does not this case conflict with Doe?
[1] § 39.464(1), Fla. Stat. (1991).
[2] In fact, the petition stated one required ground as the equivalent of the other:

It appears to be manifestly in the best interest of the child that ... an order of termination of parental rights be entered because:
A. The mother freely and voluntarily executed a written affidavit and acknowledgement of surrender, consent, waiver of notice in accordance with law.
[3] Section 39.467(2) provides:

For the purpose of determining the manifest best interests of the child, the court shall consider and evaluate all relevant factors, including, but not limited to:
(a) The ability and disposition of the parent or parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under state law in lieu of medical care, or other material needs.
(b) The capacity of the parent or parents to care for the child to the extent that the child's health and well-being will not be endangered upon the child's return home.
(c) The present mental and physical health needs of the child and the future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child.
(d) The love, affection, and other emotional ties existing between the child and the child's present parent or parents, siblings, and other relatives and the degree of harm to the child arising from the termination of parental rights and duties.
(e) The likelihood of an older child remaining in long-term foster care upon termination of parental rights due to emotional or behavioral problems or any special needs of the child.
(f) The child's ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship as a result of permanent termination of parental rights and duties.
(g) The length of time that the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
(h) The depth of the relationship existing between the child and the present custodian.
(i) The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
(j) The recommendations for the child provided by the child's guardian ad litem or legal representative.
(k) Any suitable permanent custody arrangement with a relative of the child.